**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISON**

LUMUMBA EARLE, individually and
as the Personal Representative of the
ESTATE of ANNIE EARLE, deceased,

     Plaintiff,

v.                                      Civil Action: 3:14-29536

CITY OF HUNTINGTON, d/b/a CITY OF
HUNTINGTON POLICE DEPARTMENT,
a municipal corporation; JOSH NIELD,
individually and in his official capacity;
ST. MARY'S MEDICAL CENTER, INC., d/b/a
ST. MARY'S MEDICAL CENTER,
TAMMY PEYTON, individually and in her official capacity,
TARA RAMSEY, individually and in her official capacity,
BOBBI ADAMS, individually and in her official capacity,
MELISSA BLAGG, individually and in her official capacity,
ANDREA HEATH, individually and in her official capacity,
CABELL COUNTY 911, CABELL COUNTY COMMISSION,
TED GRANT, individually and in his official capacity,
PATRICK WATKINS, individually and in his official capacity,

     Defendants.

**PLAINTIFF'S RESPONSE TO DEFENDANTS, CITY OF HUNTINGTON D/B/A**
**CITY OF HUNTINGTON POLICE DEPARTMENT AND JOSH NIELD'S,**
**MOTION FOR SUMMARY JUDGMENT**

Now comes the plaintiff, Lumumba Earle, individually and as the Personal Representative

of the Estate of Annie Earle, deceased, by and through counsel, Richard W. Weston, and responds

to Defendants, City of Huntington D/B/A City of Huntington Police Department and Josh Nield's,

Motion for Summary Judgment, and states the following in support:

**I.**    **FACTS**

On January 10, 2014, Annie Earle fell and cut her head at a neighbor of her daughter,

Stephanie Earle.  (*Stephanie Earle Depo. Trans. pp. 42*, attached as *Exhibit 1)*.  Stephanie

immediatley went to the neighbor's house and called an ambulance.  *Id*. 42-3.  The ambulance came to 419 26th Street, which is a short walk from the hospital.  See Exhibit A to Defendants motion for summary judgment.  When the ambulance arrived, Stephanie got in the ambulance with Annie and they made the short trip to St. Mary's Medical Center, Inc. ("St. Mary's").  *Id*. at 44.  Stephanie stays with her mom at St. Mary's for several hours.  *Id*.  The hospital does lengthy diagnostic testing and Stephanie's sister is watching her young children at the house.  *Id*. at 44-5.  The sister has to leave so she leaves to watch the kids.  *Id*.  In the early morning, Annie is discharged from the hospital.  St. Mary's representatives and an HPD officer contact Stephanie to pick her mother up.  *Id*. at 45-50.  Stephanie informs them she can't leave her residence to pick up Annie because she is watching four children.  *Id*. at 48.  Stephanie is unsuccessful in contacting her sister to pick up their mother.  *Id*. at 50.  She then calls Annie's caregiver, Starlight Behavioral Health Services, to see if they can arrange transportation.  *Id*. at 50.  Annie's Starlight caseworker, Donna White, goes to the St. Mary's emergency room ("ER") that morning.  (See Donna White notes attached as *Exhibit 2*).  Upon seeing Ms. White, Annie jumped up, hugged her and said "I'm glad it's you." *Id*. Ms. White assesses Annie's mental status as alert, oriented and baseline in light of her mental health issues.  *Id*.

Ms. Earle voluntarily leaves St. Mary's at 4:41 p.m. on January 11, 2014. At 4:45 p.m. St. Mary's receives a call from the Mental Hygiene Commission stating the Petition was denied for insufficient facts that Ms. Earle was likely to cause harm to herself or others.  Nurse Blagg then calls 911 and informs the operator that they were trying to get a mental hygiene order on patient, Annie Earle, but she left against medical advice.  See CAD sheet attached as *Exhibit 3*.  The information conveyed to Cabell County 911 is false and inaccurate. Nurse Blagg's call to Cabell County occurred at 4:53 p.m., 8 minutes after the Petition was denied.

Cabell County 911 dispatcher Ted Grant receives the call from Nurse Blagg.  Mr. Grant enters the information into the computer as a "walkaway" call and transfers it to Patrick Watkins.

(*Watkins Depo. Trans. pp. 14*. attached as *Exhibit 4)*. Patrick Watkins was the dedicated dispatcher for the Huntington Police Department.  *Id*. at 12-13.  Mr. Grant routes the call to Watkins because it was activity inside the city limits.  *Id*. at 22.  Based upon this call, Patrick Watkins radioed to all HPD units a be on the lookout ("BOLO") for Annie Earle.  Mr. Watkins radioed that "took the walkaway from St. Mary's hospital on a mental order...any making contact please advise."  Call Trans. 2.  At 4:56 p.m., a HPD reserve officer whom worked at O'Reilly's Auto Parts, located near St. Mary's Hospital on 31st Street, calls 911 and informs them that Ms. Earle is there.  See *Exhibit 3*.  In response, Mr. Watkins radios HPD officers Andre Jackson and Josh Nield a "check welfare" at O'Reilly's for the BOLO he put out earlier.  Call Trans. 5.  Mr. Watkins stated "[t]hey were trying to hold her on a mental order but she just walked away.  They just want her brought back if found."  Officer Travis Hagan overheard this radio traffic and asked if the hospital had a mental order to hold her or if they want her brought back to get one.  Call Trans. 6.  Watkins responds "[t]hey have one on her, they want her brought back "so Sheriff's Department can do whatever it is they need to do with her," *Id*.  Officer Nield claims he overhears this radio traffic. (*Nield Depo. Trans. pp. 19-22* attached as *Exhibit 5)*.  At this point, Officer Nield has heard that they were trying to get an order and that "they have one on her."  He doesn't do anything to verify the validity of the order even though HPD officers regularly receive inaccurate information from dispatch.  See Memo attached as *Exhibit 6,* under seal.

Nield arrives at O'Reilly's at approximately 6:06 p.m.  See *Exhibit 3*.  He finds Annie inside O'Reilly's standing at the counter talking to one of the clerks. (*Nield Statement. Trans. pp. 7.* attached as *Exhibit 7)*.  Nield tells Annie that the hospital is looking for her and she has to go with him back to the hospital.  *Id*.  Annie responds, "[w]ell, I guess so" and complies with the order by walking to his car.  *Id*.  Due to her compliance, Nield does not escort her and actually walks in front of Annie to the car.  *Id*. Annie follows behind and gets into his cruiser.  *Id*.  On the way to the

hospital, Annie talks some "nonsense" and stated "I'm going to leave the way I did before." *Id*. at 8.

By this time, Nield has already violated several HPD policies. See Policies attached as *Exhibits 8-11*. HPD's own internal investigation found that he violated numerous of the polices. See Report attached as *Exhibit 12,* filed under seal. Most importantly, HPD officers, when taking custody of a mentally ill person are required to request a second officer to assist with transport and to handcuff the subject. *Id*.

The short trip to St. Mary's is uneventful. Nield opens the door for Annie, she gets out under her own power and follows him inside. (*Nield Statement Trans. pp. 8)*. He takes Annie straight to the charge nurse desk. *Id*. at 8. Charge nurse Andi Heath is at the desk. *Id*. Nurse Heath immediately informs Nield and Annie that she was is not a patient and that she does not have a detention order. (*Heath Depo. Trans. pp. 15-16* attached as *Exhibit 13)*. Heath informs Annie that "she was free to go." *Id*. For some reason, Nield did not accept that Annie was free to leave. Emergency Room technician Amy Elkins first noticed Nield and his face was "really, really red." (*Elkins Statement Trans. pp. 2,* attached as *Exhibit 14*, and *Audio of Elkins Statement* attached as *Exhibit 15*). Annie kept trying to walk away. *Id*. Even though she was free to leave and tried to walk away, Nield kept "grabbing her by the sweater, jerking her back telling her to stay still." *Id*. The way Nield was jerking her sweater it caused Annie to be exposed. *Id*. As Nield himself states, Annie tried to throw some papers off the charge-nurse desk and walked away from him. *(Nield Statement Trans. pp. 9)*. He grabs her and holds her arms at her side. *Id*. She then pulls away from him so he pulls her towards him and holds her arms behind her back. *Id*. (Also see *Nield Depo. Trans. at pp. 31)*. Nield then physically escorts Ms. Earle to a ER examination room with nurse Heath. (*Nield Depo. Trans. pp. 40*; also see *Blagg Depo. Trans. pp. 47.* attached as *Exhibit 16)*. He has her firmly by the arms guiding her into the room. *Id*.

4

After Nield forces Annie into ER examination room 26, the testimony becomes very conflicting between Heath, Blagg and Nield.  Nield puts Annie into the room and orders her to stay there.  *(Nield Depo. Trans. pp. 40)*.  Annie attempts to exit the room, but Nield holds the door shut.  *Id*.  Nield is then informed again, by a different nurse, that the detention order was not in effect.  *Id*. at 41.[1]  By this time, Annie has been imprisoned for approximately 20-30 minutes.  (*Heath Depo. Trans. pp. 25*).  After initially trying to exit the room but being forced to stay inside by Nield, Annie has now barricaded herself inside by placing herself and her chair against the door.  (*Nield Statement Trans*. *pp. 12*).  Nield forces the door open causing the chair to slide and Annie to jump out of the chair.  (*Nield Statement Trans. pp. 12*).  Annie then allegedly put her hands up in the air and talks gibberish.  *Id*.  Nield responded by removing his taser and "arcing" it at her.[2]  Arcing a taser causes an electricity bolt to transmit between two poles and makes a popping noise so the person knows "it's going to hurt."  (*Nield Statement Trans. pp. 14)*.  Annie responds to the arcing of the taser by sitting down on the hospital bed.  *Id*. at 16.

Ironically, at this point, Nield's dissatisfaction with Annie had changed completely.  Instead of telling Ms. Earle she could not leave the hospital, and using physical force to accomplish the objective, Nield now tells Annie she has to leave the hospital and cannot stay.  (*Nield Statement Trans. pp. 17)*.  Annie told Nield that she was not leaving.  *Id*.  Nield had other plans and went after her.  *Id*.  As he approached her, Annie fled to the far side of the room.  *Id*. As Nield closed in on her, Annie pushes a computer cart at him to keep him away.  *Id*. at 18.  Nield keeps closing in on her until she was cornered.  Cornered, with Nield coming at her, Annie allegedly swings at him.  *Id*.  Nurse Heath writes in her original written statement that Annie then fell to the floor.  (*Heath*

---

[1] Nield states this is the first time he was told the detention order was denied and therefore recognized "at that point Ms. Earle was free to leave the hospital." (*Nield Depo. Trans. pp. 17)*.  Nurse Blagg states she did not tell Nield directly about the detention order being denied, but told nurse Heath outside room 26 the order was denied while Nield was in the room with Annie and the door was shut.  (Heath Statement pp. 1*)*.

[2] A video of a taser being arced can be viewed at https://www.youtube.com/watch?v=RlpCeDcwtDI

*Statement pp. 3,* attached as *Exhibit 17*).  ER tech Amy Elkins did not see what happened in the room.  However, Nurse Heath came out of the room and looked down the hall at Ms. Elkins.  (*Elkins Statement Trans. pp. 3*; and *Audio of Elkins Statement*).  She tells Ms. Elkins that Annie swung at the police officer and he then called her a "fucking bitch" and slammed her to the floor.  *Id*.  Nield then grabs her by the neck and arm and forces her to the ground.  (*Nield Statement Trans. pp. 19-20*).  He then comes down on top of her a driving his knee into her chest with his full 260 pounds.  (*Nield Statement Trans. pp. 20*; *Nield Depo. Trans. pp. 57*).  Nield then states he handcuffs Annie's left hand, flips her over and handcuffs her hands behind her back.  (*Nield Depo. Trans. pp. 58-59*).

Melissa Blagg hears movement in the room and walks back to the room to see what is happening. (*Blagg Statement pp. 1*, attached as *Exhibit 18*). Nurse Blagg sees Nield holding Annie on the ground with his hand on her neck.  *Id*.  He is handcuffing Annie.  *Id*.  Nurse Blagg decides to leave the room.  *Id*.  She then hears Nield screaming at Annie, again, that she is a "dumb fucking bitch."  *(Blagg Depo. Trans. pp 51-52)*. Nield's behavior was not calm or collected and his loud screaming scares her.  *Id*.  Nurse Heath then enters the room and finds her handcuffed, facedown with agonal breathing. *(Heath Depo. Trans. pp. 27)*.

Dr. Vernard I. Adams performed an autopsy on Annie shortly thereafter.  See Autopsy Report Attached as *Exhibit 19*; Pictures attached as *Exhibit 20*.  Annie was 66 years old and weighed 117 pounds.  Dr. Adams determined that Nield broke Annie's ribs at four different places.  *Id*. at 3.  He killed her by lacerating her heart due to compression of the thorax.  *Id*. at 2.  In layman's terms, this means he drove his knee so hard into her chest that it caused her heart to burst.

## II.    SUMMARY OF ARGUMENT

Officer Josh Nield intentionally killed Annie Earle by driving his 260 pounds into her chest with his knee. The last words she heard before dying were Nield screaming that she was a stupid fucking bitch.  Nield attempts to evade liability for his abhorrent behavior by hiding behind the

legal concept of qualified immunity.  Qualified immunity has two prongs: 1) was a constitutional violation committed; and, 2) was the right clearly established.  Nield does not even mention in his brief that he did not commit constitutional violations.  Instead, he simply argues that no law clearly informed him his conduct was illegal.  Nothing could be further from the truth.  West Virginia statutory law puts Nield on clear notice that he does not have the authority to transport involuntary hospitalized mental patients.  Despite this clear law, Nield illegally seized Annie and transported her to St. Mary's. Even after he was informed the involuntary hospitalization petition was denied, he continued his illegal seizure and would not let Annie leave.  When Annie finally decided she wanted to stay at the hospital, likely to get away from Nield, he arced a taser and then cornered her, forcing her to scratch him to keep him away from her.  In 2003, the Fourth Circuit put Neild on clear notice, in nearly identical facts, that he did not have the right to seize Annie Earle and he did not have the right to use the type of force he did.

## III.    ARGUMENT

### A.    NIELD'S ACTIONS VIOLATED ANNIE EARLE'S CONSTITUTIONAL RIGHTS TO BE FREE FROM AN ILLEGAL SEIZURE

A person is "seized" within the meaning of the Fourth Amendment if, " 'in view of all [of] the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.' " *United States v. Gray*, 883 F.2d 320, 322 (4th Cir.1989) (quoting *United States v. Mendenhall*,  446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980)).

#### a.    Nield did not have any authority to seize Ms. Earle at O'Reilly Auto Parts

On January 11, 2014, Josh Nield receives information from 911 dispatch that Annie Earle had an order on her and St. Mary's hospital wanted her brought back.  See 911 transcript, attached as *Exhibit 21; Nield Depo. Trans. pp. 21-2*.  He also receives information that Ms. Earle was at O'Reilly Auto Part's Store.  *Id*.  Based upon this information, Nield travels to O'Reilly's and makes contact with Annie.  She is very cooperative and complied with Nield's order to get in his car for

return to St. Mary's.  (*Nield Depo. Trans. pp. 26*).  Undoubtedly, at the time Nield ordered Annie into his car, she was seized.[3]

The only reason Nield states for this seizure is that Annie had an active mental hygiene order and he took her into custody based upon notification from 911 dispatch.  (*Nield Depo. Trans. pp. 21*). He does not assert that he had probable cause for an arrest or obtain a mental evaluation. Although we now know that a mental hygiene order was not pending against Annie, Nield believes the vague information he received confirmed there was an active warrant to hold Annie. Nevertheless, even if a mental hygiene order is pending, a police officer does not have authority to detain someone until after a judge orders the detention.  The statutory framework for involuntary hospitalization in our state is found at West Virginia Code § 27-5-1, et. seq.  As this Court recognized in this case after reviewing this framework, "[t]he circuit court, mental hygiene commissioner or designated magistrate may enter an order for the individual named in the application to be detained and taken into custody for the purpose of holding a probable cause hearing." See Memorandum Order and Opinion dated June 8, 2016.  W. Va. Code Ann. § 27-5-2 (West 2016). This application process for a mental hygiene order does not provide for involuntary custody while an application is still pending. *Id*. (allowing for detention only after petition has been granted).  *Id*.

In our case, the involuntary hospitalization petition was denied on its face because it did not allege facts stating Annie was a danger to herself or others.  See Order Denying attached as *Exhibit 22*.  It is important to note that the petition was not even near the probable cause stage.  St. Mary's filed the petition which was forwarded to the Mental Hygiene Commissioner.  This is the point, referenced in § 27-5-2, when the commissioner may order detention and custody to conduct

---

[3] A police-citizen encounter rises to the level of a Fourth Amendment seizure when "the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen...." *Santos v. Frederick Cnty. Bd. of Comm'rs*, 725 F.3d 451, 460 (4th Cir., 2013)(citing *United States v. Jones*, 678 F.3d 293, 299.

a probable cause hearing.  The commissioner could also order a probable cause hearing without detention.  In our case, the petition was summarily denied due to "insufficient facts alleged supporting the claim that Respondent is likely to cause serious harm to herself or others."  See *Exhibit 22*.

Quite simply, West Virginia law provides that no type of law enforcement had any right to seize Annie.  However, even if the commissioner had ordered Annie taken into custody for involuntary hospitalization, a municipal officer such as Neild would not have had authority to seize her anyway.  The statutory framework has a specific provision titled transportation for the Mentally Ill or Substance Abuser. § 27-5-10.  The statute provides that if transportation of the mentally ill is required to a mental health facility it "shall be the duty of the sheriff."  § 27-5-10(a).  The statute further provides that municipal officers, such as Neild, may perform the duties of the sheriff by *written agreement*.  § 27-5-10(c).  In this case, there is no written agreement between the Cabell County Sheriff's Department and the Huntington Police Department.  Neild admitted that the Sheriff's department handles mental hygiene order.  (*Neild Depo. Trans. pp. 21*).  However, he thought he had authority to transport Annie due to a "mutual aid kind of thing" between the two departments.  *Id*.  Nevertheless, he admitted he was not aware of any written or verbal directive regarding this mutual aid.  (*Id*. at 22). HPD Lieutenant John Williams confirms there is not a written agreement between the parties on the matter. (*Williams Trans. Depo. pp 48-49*, attached as *Exhibit 23)*.

     **b.**    **Neild did not have authority to continue his seizure of Ms. Earle at St. Mary's Hospital**

Neild's illegal seizure of Annie continues at the charge nurse desk even though he is immediatley informed the mental hygiene order was denied.  When Neild arrived the hospital charge nurse desk, nurse Heath informed him immediatley that the mental hygiene order was denied.  (*Heath Depo. Trans. pp. 15-16)*.  At this point, Neild should have exited the building

because, even in his own mind, he knew he had no authority to hold Annie once he found out the petition was denied. (*Nield Depo. Trans. pp. 44*)(" she didn't have a hygiene order and she was free to go."  He states he found out no order existed when entering the hospital room, not at the nursing desk.  Nevertheless, it displays he knew he was free to leave absent an order.))  Officer Nield admits that Ms. Earle had not committed any criminal violations up until the point.  (*Nield Depo. Trans. pp. 43*).  The only unusual behavior Nield articulated was that Annie tried to knock some papers off a desk.  (*Neild Statement Trans. pp. 9*).  Nurse Heath informed Annie she was free to leave.  (*Heath Depo. Trans. pp. 15-16*).  For some inexplicable reason, when she tried to leave, Nield kept grabbing her, partially disrobed her, and told her to stay still.  (*Elkins Statement Trans. pp.2*).  Instead of letting her leave, he grabbed both her arms and placed them behind her back and forcefully put her in an examination room.  When she tried to leave the room, he held the door handle shut so that she could not leave.  At this point, when Nield states he learned the order is denied, he acknowledges that she was free to go.  He could, and should have, exited the building.  Instead, he continues his illegal seizure by forcing the door open and knocking Annie out of her chair that was against the door.  In a bizarre twist, Nield was not now ordering Annie to stay at the hospital, he was now ordering her to leave!

West Virginia code 27-5-2(e) defines a "psychiatric emergency" as an incident during which an individual loses control and behaves in a manner that poses substantial likelihood of physical harm to himself, herself or others. Nield does not describe Annie's behavior as having a substantial likelihood of harm.  The most he could say was that her "behavior could have been viewed as *potentially* dangerous to herself or others." *(Nield Depo. Trans. pp. 43)*. There is a large difference between potentially dangerous and a substantial likelihood of dangerousness.  HPD's own policy and procedure manual provides that its officers can only take custody of mentally ill persons if they "present a danger to the safety of themselves or others and meets the criteria for

involuntary emergency or non-emergency mental commitment."  By Nield's own admissions, she

did not meet either of these categories.

B.    NIELD'S ACTIONS VIOLATED ANNIE EARLE'S CONSTITUTIONAL RIGHTS TO
       BE FREE FROM EXCESSIVE FORCE

In a similar case, *Bailey v. Kennedy*, 349 F.3d 731 (4th Cir., 2003) the Fourth Circuit

summarized the applicable law:  "The Fourth Amendment prohibition on unreasonable seizures

bars police officers from using excessive force to seize a free citizen." *Jones v. Buchanan*, 325 F.3d

520, 527 (4th Cir.2003). We determine whether an officer has used excessive force to effect a

seizure based on a standard of "`objective reasonableness.'" *Id*.  (quoting *Graham v. Connor*, 490

U.S. 386, 399, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). "We weigh the nature and quality of the

intrusion on the individual's Fourth Amendment interests against the countervailing governmental

interests at stake. This test requires us to determine the reasonableness of an officer's actions and

is not capable of precise definition or mechanical application. Instead it requires careful attention

to the facts and circumstances of each particular case." *Id*. (quotation marks omitted).  *Id*.  Those

facts and circumstances include "the severity of the crime at issue, whether the suspect poses an

immediate threat to the safety of the officers or others, and whether [the suspect] is actively

resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396, 109

S.Ct. 1865, 104 L.Ed.2d 443 (1989). "The extent of the plaintiff's injury is also a relevant

consideration." *Jones*, 325 F.3d at 527.   As this Court has stated, [o]f course, on summary

judgment, the facts must still be viewed in the light most favorable to the plaintiff and inferences

viewed in his favor.   *Revely v. City of Huntington, et al.,* Case No. 3:07-0648 (2009)(citing

*Matsushita Elec. Indus. Co., L*td. 475 U.S. 574.  The ultimate question is whether the totality of

the circumstances justify the type of seizure effectuated by the officer.  *Id*. (citing *Tennessee v.

Garner*, 471 U.S. 1, 8-9 (1985)).  "The court must not consider facts in isolation but must review

the situation in its entirety." *Revelry at pp. 7.*

In *Bailey*, officers were called because Mr. Bailey was riding his bike while intoxicated and fell down at a neighbor's house.  *Id*. at 734.  The neighbor called 911, whom relayed to the police that Mr. Bailey stated he was going to commit suicide.  *Id*.  Officers Whitley and Kennedy first responded to the call.  *Id*.  Mr. Bailey let Whitley in the house where he stated there were guns in the house but denied he was going to commit suicide.  Officer Whitley then exited the home at the same time officer Dennedy arrived on scene.  *Id*. at 735.  Whitley told Kennedy "they were going to have to do something."  *Id*. Whitley then went back to the door and rang the doorbell.  *Id*. Mr. Bailey opened the door and told the officers they needed to leave.  *Id*.  Kennedy reached in and grabbed Michael's arm to pull him onto the porch.  *Id*.  Kennedy then stepped inside the house and began to fight him and attempted to take him to the floor.  *Id*.  Kennedy then tackled him to the floor.  *Id*.  Officers placed one handcuff on Mr. Bailey and then punched him in the face requiring stitches.  *Id*.  He was then handcuffed and roughed up some more.  *Id*.

In *Bailey,* the court analyzed the first factor of the severity of the crime in favor of Mr. Baily because he did not commit a crime.  Likewise, in our case, Annie had not committed a crime when seized.  It is important to note that the *Bailey* court did make a finding that he resisted arrest.  However, in regard to this first prong, the court analyzed whether a crime had been committed at the time of seizure.  *Id*. at 743-4.  Even Nield states that Annie did not commit a crime until she struck him.  Furthermore, the *Bailey* court noted that if a person has not committed a crime, and is subjected to force, it is much more likely that excessive force will be found.  *Id.* at. 743("we have twice confronted situation in which a plaintiff, subjected to police force, had committed no crime; in each, we held that the plaintiff had stated a claim for violation of his constitutional right to be free from excessive force."  *Jones*, 325 F.3d at 528 (citing *Clem v. Corbeau*, 284 F.3d 543, 545-47 (4th Cir.2002); *Park v. Shiflett*, 250 F.3d 843, 848, 853 (4th Cir.2001)).  Because Annie did not take any action against Nield until well after he seized and abused her, this factor clearly weighs in her favor.

The next factor, whether the suspect poses an immediate threat to the safety of the officers or others, also is in favor of Annie.  Again, the *Bailey* court analyzes this factor at the time Mr. Bailey was seized.  *Id*. at 744.  In *Bailey*, at the time the officer initiated force to seize him, he was shutting the door to his parents' home.  *Id*.  The court further noted Mr. Bailey was unarmed.  *Id*. The Court held that no reasonable officer could conclude he was an immediate threat.  *Id*. Likewise, Annie was unarmed.  Upon ordering her to get into the vehicle at O'Reilly, Nield describes her as cooperative.  *(Nield Depo. Trans. pp. 26)*.  The forceful seizure began at the charge nurse desk, when, after being informed there was not an order to hold her and told she was free to leave, Annie tried to walk away.  (*Elkins Statement Trans. pp. 2*).  Instead of allowing this to happen, Nield grabbed both of Annie's arms, put them behind her back and forcefully put her into a room and closed the door.  (*Neild Statement Trans. pp. 9*). He then held her in the room by the door handle for no reason.  He then forces open the door knocking Annie and her chair out of the way.  (*Neild Statement Trans. 12*). He then escalates the situation by arcing a taser at her. Deploying a taser is a serious use of force.  *Estate of Armstrong v. Vill. of Pinehurst*, 810 F.3d 892 (4th Cir.)(citing  *Cavanaugh v. Woods Cross City*, 625F.3d 661, 665 (10th Cir.2010).  After all of this egregious behavior with no legal justification, the most that Nield can say Annie did was put her hands up in the air, which he took as a fighting gesture, and asked him if he wanted to die. None of those are threats and none are acts of violence taken in the light most favorable to Annie. The threat to Nield was absolutely zero until he attacked her the last time.

In regard to the next factor, whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight, this factor also weighs in favor of Annie.  As in *Bailey*, Annie only resisted arrest after she had been illegally seized.  However, she only resisted arrested after a long period of seizure of repeated abuses.  The initial grabbing of Annie at the charge nurse desk and escort to the room was excessive force.  Knocking Annie out of her chair was excessive force.  Arcing the taser, while not technically excessive force, certainly did not help the situation.  It is important to

note that, as Nield makes his last pursuit of Annie into the corner of her room, he was is now telling her that she has to leave with him; the exact opposite of what he told her up to that point.  It was only after he cornered her that she swung and scratched his face.  At point, he grabbed Annie by the neck and called her a "stupid bitch."  He then "slammed" her to the ground.  He then put his full weight of 260 pounds into her sternum with his knee.  A two hundred sixty pound police officer driving his knee into an elderly woman that weighs 117 pounds is excessive force when all she has done is scratch him.  It is not objectively reasonable.

Nield claims that the knee in her chest was unintentional.  *Id*. at 98.  It should also be remembered that "the court must not consider facts in isolation but must review the situation in its entirety." Several factors persuade that this was an intentional act when reasonable inferences are taken in Annie's favor.  First, as Amy Elkins states, Nield's face was already red at the charge nurse desk.  He was already mad.  Second, as nurse Heath relayed to Amy Elkins, Nield called her a "fucking bitch" and slammed her to the floor.  Slamming someone to the floor is far different than, as Nield describes, wrestling with them and getting tangled up and falling down.  *(Nield Depo. Trans. pp. 98).*  Further, calling someone a "fucking bitch" evinces a clear lack of regard for professionalism and human dignity.  A reasonable inference when calling someone a fucking bitch before slamming them to the ground is that you mean to do them bodily harm.  Nield also did not discontinue his tirade when he had Annie on the ground.  Nurse Blagg witnessed Nield with his hand around her neck on the ground while handcuffing her.  He was not calm or collected and screamed at her that she was a "stupid fucking bitch."  Let that sink in.  He had just committed the act that killed a 117-pound elderly, mentally challenged woman. The last words she heard were Nield standing over her, screaming that she was a stupid fucking bitch.  Finally, we must look to the extent of the plaintiff's injury.  Annie suffered the ultimate, final injury; death.

Nield's illegal detainment of Annie Earle lasted from the time he placed her in custody at O'Reilly, through the car ride to the hospital, when she was told she could leave at the charge nurse

14

desk, when he then became physical with her until he killed her.  Annie did not attempt to harm anyone until the very end when Nield cornered her and she had nowhere else to go.  Only then did she swing and scratch.  This is self-defense.  Courts are reluctant to endorse violence against police officers, even when they are illegally detained.  However, West Virginia is one of the few states left where it is clearly established that citizens have the right to fight back against illegal police action.  See *State v. Gum,* 69 S.E. 463, 465 (W. Va. 1910); also see *John Bad Elk v. United States*, 177 U.S. 529, 20 S.Ct. 729, 44 L.Ed. 874 (1900)

C.     STATUTORY AND CASE LAW PUT NIELD ON CLEAR NOTICE HIS BEHAVIOR WAS UNCONSTITUTIONAL

Qualified immunity attaches when an official's conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix v. Luna*, 136 S. Ct. 305 (2015).  The Fourth Circuit summarized our qualified immunity law in *Santos v. Frederick Cnty. Bd. of Comm'rs*, 725 F.3d 451, 468-9 (4th Cir. 2013) stating:  Because government officials cannot "reasonably be expected to anticipate subsequent legal developments," the right must have been clearly established at the time an official engaged in a challenged action. *Harlow*,  457 U.S. at 818, 102 S.Ct. 2727. Nonetheless, there need not have been a judicial decision squarely on all fours for a government official to be on notice that an action is unconstitutional. *Meyers*,  713 F.3d at 734 (noting that this  Court "repeatedly ha[s] held that it is not required that a right violated already have been recognized by a court in a specific context before such right may be held 'clearly established' for purposes of qualified immunity"); see also *Hope v. Pelzer*,  536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (stating that "officials can still be on notice that their conduct violates established law even in novel factual circumstances").

a.     **Nield's initial seizure of Annie at O'Reilly was clearly unconstitutional as provided in West Virginia Statute**

Much of the discussion for this analysis was done under whether a constitutional violation existed.  Simply, the only reason Nield states for this seizure is that Annie had an active mental hygiene order and he took her into custody based upon notification from 911 dispatch.  *(Nield Depo. Trans. pp 21)*.  West Virginia Code § 27-5-10 put him on clear notice that he did not have the authority to transport Annie to a medical facility.  Nield is a municipal officer.  The statute unequivocally states that transportation to a medical facility shall be done by the sheriff.  The statute further provides that municipal officers, such as Nield, may perform the duties of the sheriff only by *written agreement*.  § 27-5-10(c).  No such agreement exists.

**b.    Nield's continued Seizure and Excessive Force were Clearly Established in the Nearly Identical Fourth Circuit Case of *Bailey v. Kennedy***

The facts of *Bailey* are discussed at length above.  The only differences in the two cases are that in *Bailey* the officer never heard there was an active mental hygiene warrant and in the case at bar the injury was much more severe.  The fact that Nield was initially told an order existed should not matter because (a) as described above Nield was on notice that he could not detain Annie; and, (b) assuming *arguendo* that initial detention was valid, Nield learned the order had not gone through at the charge nurse desk and continued to detain Annie without probable cause and then used excessive force on a person that was not lawfully detained.  In *Bailey*, the police made an illegal seizure on a mentally ill person without probable cause.  The same thing happened to Annie Earle.  Furthermore, once the person was illegally detained, they resisted arrest.  Annie waited much longer than Mr. Bailey before she resisted arrest.  Mr. Bailey resisted once the police seized him.  Annie suffered detainment, being grabbed at the charge nurse desk, being locked in a hospital room, had a taser arced at her and did not resist until she was cornered by pushing a desk at Nield and scratching his face.  *Bailey* recognized two distinct rights that likewise apply to Annie:  "the general right to be free from seizure unless probable cause exists [is] clearly established in the mental health seizure context."  We have also recognized that "an officer must

have probable cause to believe that the individual posed a danger to [him]self or others before involuntarily detaining the individual." *Bailey* at 741 (internal citations omitted).  Although *Bailey* defined its precise seizure right more narrowly, it denied qualified immunity because " the contours of probable cause were sufficiently clear that the unlawfulness of seizing someone in such a situation would have been apparent to reasonable officers."  *Id*. at 741-2.  In this case, the seizure continued after Nield knew the order was denied, which meant there could not have been probable cause, and he could only articulate that Annie's behavior was "potentially" dangerous.  Almost any behavior can be potentially dangerous and that is not the test, the test is if the behavior is in fact dangerous, which Annie's was not.

In regard to excessive force, *Bailey* put Nield on clear notice that he could not use the level of force he did after illegally seizing someone, even if that person offered resistance.  In *Bailey*, the person resisted after his illegal arrest and at most he received a few punches that cut his lip. Annie received the full weight of Nield to her sternum via his knee.  Furthermore, pursuant to state law, Annie had the right to resist the illegal seizure.

D.   FEDERAL CLAIMS AGAINST THE CITY OF HUNTINGTON CANNOT BE DISMISSED BASED UPON A FINDING OF QUALIFIED IMMUNITY OF OFFICER NEILD

Should the Court find that Officer Neild is entitled to qualified immunity only because the constitutional violation was not clearly established at the time of the violation, dismissal of the City of Huntington is not automatic. In order to dismiss the City of Huntington from suit, the Court must also definitively find there was no constitutional violation at all. In a case similar to the case a bar, *Santos v. Frederick Cnty. Bd. Of Comm'rs*, 725 F.3d 451 (4th Cir., 2013), the Court reversed the lower court's dismissal of the municipal liability claims, despite a finding that the deputies were entitled to qualified immunity because the violation was not clearly established. *Id.* at 470.

E.    SUPPLEMENTAL JURISDICTION SHOULD BE RETAINED BY THE COURT

It is well established that a District Court may exercise supplemental jurisdiction over state law claims were the original jurisdiction has been extinguished. *Shanaghan v. Cahill*, 58 F.3d 106, 110 (4th Cir. 1995). ([T]rial courts enjoy wide latitude in determining whether or not to retain jurisdiction over state claims when all federal claims have been extinguished.")  28 U.S.C. §1367(c) lists circumstances when district courts should decline to retain supplemental jurisdiction over state law claims, specifically when: (1) the claim raises novel or complex issues of state law; (2) the claim substantially predominates over federal claims, (3) all federal claims have been dismissed, or (4) other compelling reasons exist for declining jurisdiction. 28 U.S.C. §1367(c) (2012); *Chicago v. International College of Surgeons*, 522 U.S. 156, 173 (1997); *Hinson v. Norwest Fin. S. Carolina, Inc.*, 239 F.3d 611, 617 (4th Cir. 2001). Additional factors to consider are convenience and fairness to the parties, the existence of any underlying issues of federal policy, comity, and consideration of judicial economy. *Shanaghan,* 58 F.3d. at 110. A balancing of the factors in this case strongly support the exercise of supplemental jurisdiction over the state law claims.

As to the first factor, there is no pending challenge that plaintiff's state law claims are novel, complex or subject to unsettled state law. As to the second factor, plaintiff's state law claims do not significantly predominate over the original jurisdiction claims as they all arise out of a common nucleus of facts. As to the third and fourth factors, dismissal of plaintiff's original jurisdiction claims would obviously favor declining supplemental jurisdiction; however, the Court must also look convenience and fairness to the parties. *Shanaghan,* 58 F.3d. at 110. Importantly, plaintiff's case was filed directly in Federal Court and was not the subject of a removal action; therefore, declining supplemental jurisdiction would mean starting from scratch. It would also result in additional costs and expense to the parties. Secondly, the statute of limitations on Plaintiff's state law claims would have expired as of January 11, 2016.

Without a remand option, and if §1367(d) is challenged, plaintiff's claims would be barred from suit.

Defendant's reliance on *Carnegie-Mellon University v. Cohill,* 484 U.S. 343, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988) to support its position for declining supplemental jurisdiction is misplaced. Although *Cohill* is applicable, Defendant's interpretation is flawed. *Cohill* was a case where remand to State Court was a possibility; remand is not a possibility in this case. Even when remand is a possibility, *Cohill* identified the injustice of a dismissal in situations where the statute of limitations on state law claims have run and the time and expense refiling in state court will cause. *Id.*[4] Finally, judicial economy is best served by keeping jurisdiction. As stated in *Shanaghan,* "courts should account for the amount of time and energy that has already been expended, and decide whether it might be more efficient to simply retain jurisdiction." *Shanaghan,* 58 F.3d at 112, citing *Washington v. Union Carbide Corp.*, 870 F.2d 957, 962 (4th Cir. 1989). Therefore, based on the above, the Court should exercise supplemental jurisdiction over plaintiff's state law claims.

## IV.    CONCLUSION

Wherefore, the Plaintiff respectfully moves this Court to deny the Defendants' summary judgment motion, and any other relief this Court deems necessary.


                                LUMUMBA EARLE,
                                An Individual,


        By Counsel:    /s/Richard W. Weston
                       Richard W. Weston (WVSB # 9734)
                       WESTON | ROBERTSON
                       337 Fifth Avenue
                       Huntington, WV 25701
                       (304) 522-4100

---

[4] The Court further stated that dismissal of state law claims would have a chilling effect on plaintiffs bringing otherwise appropriate federal law claims. *Id.* at fn. 9.

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF WEST VIRGINIA

### HUNTINGTON DIVISON

LUMUMBA EARLE, individually and
as the Personal Representative of the
ESTATE of ANNIE EARLE, deceased,

      Plaintiff,

v.                                  Civil Action: 3:14-29536

CITY OF HUNTINGTON, d/b/a CITY OF
HUNTINGTON POLICE DEPARTMENT,
a municipal corporation; JOSH NIELD,
individually and in his official capacity;
ST. MARY'S MEDICAL CENTER, INC., d/b/a
ST. MARY'S MEDICAL CENTER,
TAMMY PEYTON, individually and in her official capacity,
TARA RAMSEY, individually and in her official capacity,
BOBBI ADAMS, individually and in her official capacity,
MELISSA BLAGG, individually and in her official capacity,
ANDREA HEATH, individually and in her official capacity,
CABELL COUNTY 911, CABELL COUNTY COMMISSION,
TED GRANT, individually and in his official capacity,
PATRICK WATKINS, individually and in his official capacity,

      Defendants.

### CERTIFICATE OF SERVICE

I, Richard W. Weston, do hereby certify that on this 1st day of June 2017, I electronically filed the foregoing "**PLAINTIFF'S RESPONSE TO DEFENDANTS, CITY OF HUNTINGTON D/B/A CITY OF HUNTINGTON POLICE DEPARTMENT AND JOSH NIELD'S, MOTION FOR SUMMARY JUDGMENT**," with the court using the CM/ECF system which will send notification of such filing to the below counsel of record:

      Steve Nord, Esquire
      Offutt Nord Burchett
      PO Box 2868
      Huntington, WV 25728
      sknord@onblaw.com

Robert M. Sellards, Esquire
Alex Turner, Esquire
J. Lauren H. Savory, Esquire
Nelson Mullins Riley & Scarborough LLP
PO Box 1856
Huntington, WV 25719-1856

Lee Murray Hall
Nathanial A. Kuratomi
Jenkins Fenstermaker, PLLC
PO Box 2688
Huntington, WV 25726

/s/ Richard W. Weston
Richard W. Weston
WESTON | ROBERTSON
West Virginia State Bar No. 9734
337 Fifth Avenue
Huntington, West Virginia 25701
Phone: (304) 522-4100