IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

LUMUMBA EARLE, individually and
as the Personal Representative of the
ESTATE of ANNIE EARLE, deceased,

    Plaintiff,

v.           CIVIL ACTION NO. 3:14-29536

CITY OF HUNTINGTON, d/b/a CITY OF
HUNTINGTON POLICE DEPARTMENT,
a municipal corporation, et al.,

    Defendants.

MEMORANDUM OPINION AND ORDER

  Pending before the Court is Defendants City of Huntington and Josh Nield's (collectively

Defendants) Motion for Summary Judgment (ECF No. 297).  Defendants also moved to Set a

Hearing on the Motion (ECF No. 309) for oral argument.  The Court held a Pretrial Conference

on July 5, 2017 and finds another hearing unnecessary.  The Court, thus, **DENIES** Defendants'

Motion for a Hearing (ECF No. 309).  For the following reasons, the Court **GRANTS in part**

**and DENIES in part** Defendants' Motion for Summary Judgment (ECF No. 297).  The Court

defers ruling on the Motion for Summary Judgment (ECF No. 297) in regards to the City of

Huntington's municipal liability argument to allow further briefing.

### I.  Background[1]

---

 [1] In a summary judgment analysis, the Court is to view the facts in the light most favorable
to the nonmoving party.  The Court, thus, reviews the factual background based on Plaintiff's
version of the facts that are supported by the record, noting the instances in which Defendants
provide contradictory evidence.

Plaintiff filed the instant case against these two Defendants, bringing claims of constitutional and state law violations for the actions that led to the unfortunate death of Ms. Annie Earle (Earle) on January 11, 2014.[2]  *See Pl.'s Third Am. Compl.*, ECF No. 111.  According to Starlight Behavioral Health Services (Starlight), Earle had been diagnosed with "Schizophrenia, paranoia type, PTSD, and Major Depressive Order."  *See ACT Discharge Summary*, ECF No. 298-2.  Earle was originally taken to St. Mary's Hospital on January 10, 2014 for treatment for a head laceration.  *See Stephanie Earle Tr.*, ECF No. 311-1, at 42:17-21.  Earle's daughter left the hospital once Earle was stable but required further treatment.  *Id.* at 45:8-14.

In the early morning hours of January 11, 2014, the hospital prepared Earle for discharge, but the nursing staff could not get ahold of Earle's family to arrange transportation.  *See Clinical Notes Report*, ECF No. 298-3, at 5.  The nurses encouraged Earle to remain at the hospital until someone could transport her home safely, and the Clinical Notes specify that Earle agreed to stay through 3:00 p.m. that day.  *Id.* at 1.  Ms. Donna White, Earle's Starlight caseworker, visited Earle at the hospital around 11:30 a.m., noting that Earle's mental status was "baseline in light of her chronic mental health issues."  *Statement of Events*, ECF No. 311-2, at 1.  Nurse Bobbi Adams filed an Application for Involuntary Custody for Mental Health Examination (mental hygiene order) for Earle at approximately 1:00 p.m.  *See Mental Hygiene Order*, ECF No. 298-6; *Clinical Notes Report*, ECF No. 298-3, at 2.  The application remained pending when, at approximately 4:41 p.m., Earle decided to leave the hospital on her own volition.  *Clinical Notes Report*, ECF No. 298-3, at 2.

---

[2]  The Court provides the factual background most relevant to the instant summary judgment motion, focusing on the events involving Officer Nield.  Although information regarding the January 10, 2014 hospital visit is included for context, the Court provides a more thorough discussion of Defendant St. Mary's actions in the contemporaneously filed Memorandum Opinion and Order regarding Defendant St. Mary's Motions for Partial Summary Judgment.

Nurse Melissa Blagg called Cabell County 911 at approximately 4:53 p.m. to report that Earle had walked away against medical advice and that the hospital had been trying to get a mental hygiene order over her. *See 911 Transcript*, ECF No. 311-21; *Clinical Notes Report*, ECF No. 298-3, at 1 (marking entry at 4:55 p.m.). The Mental Health Commissioner denied the mental hygiene order for insufficient facts that Earle was likely to cause harm to herself or others; the denial was marked by voice order at 4:55 p.m.[3] *See Order/Notice*, ECF No. 311-22, at 1. No one called to update Cabell County 911 when the mental hygiene order was denied. In response to the hospital's call, dispatch reported to the police officers that Earle had walked away from St. Mary's. *See 911 Transcript*, ECF No. 311-21. After an incoming call indicated that Earle had entered a nearby O'Reilly's Auto Parts store, dispatch radioed Huntington Police Officer Andre Jackson and Defendant Officer Josh Nield (Officer Nield) to bring Earle back to St. Mary's. *Id.* Another officer asked for clarification on the mental hygiene order status, and the dispatcher erroneously stated that the hospital had acquired the order over Earle. *Id.* Officer Nield heard this, responded to the call, and drove to O'Reilly's to transport Earle back to St. Mary's. *See Josh Nield Dep.*, ECF No. 298-7, at 21:6-9.

Officer Nield entered O'Reilly's and saw Earle at the checkout counter. *Id.* at 25:5. Earle apparently was talking "gibberish as far as incomplete sentences, hopping from one train of thought to another." *Id.* at 116:18-19. Officer Nield told Earle that "St. Mary's had wanted her

---

[3] The timing of this decision is disputed. In the exhibits presented for this Motion, the mental hygiene order was signed and marked at 4:55 p.m. for denial by voice order. *See Order/Notice*, ECF No. 311-22, at 1. However, in the exhibits provided for the Partial Motions for Summary Judgment by Defendant St. Mary's, Nurse Adams noted that the mental hygiene order was denied at 4:45 p.m. and that she conveyed this information to Nurse Blagg at approximately 4:48 p.m. *See SMMC Medical Records*, ECF No. 328-1, at 14 (Nurse Adams's hand written notes with notations for time). For the purposes of this Motion, the time differential is immaterial.

back and that she needed to go back to the hospital." *Id.* at 25:13-15. Earle followed Officer Nield compliantly to his patrol car and rode in the back seat back to the hospital. *See id.* at 27-28. Officer Nield did not handcuff Earle and did not wait for other police officers to join him at the scene. *See id.* at 100:13-22. Officer Nield reported in his initial interview that Earle stated that she would walk away from the hospital again upon return. *See Josh Nield Interview*, ECF No. 311-7, at 8:14-16. Once arriving at St. Mary's, Officer Nield led Earle to the Nurse's Station in the Emergency Room. *See id.* at 8-9.

Officer Nield approached Nurse Andrea Heath at the Nurse's Station and told her that he was returning the walkaway. *See Josh Nield Dep.*, ECF No. 298-7, at 29:9-10. Amy Elkins, an Emergency Room technician, stated that she saw Officer Nield with Earle at the Nurse's Station and that Officer Nield's "face was really really red." *Amy Elkins Interview*, ECF No. 311-14, at 2. Nurse Heath advised Officer Nield that Earle was no longer a patient at the hospital and that the detention order had been denied, so Earle was free to leave. *See Andrea Heath Dep.*, ECF No. 311-13, at 15:12-15.[4]

The record is undisputed that Earle became agitated at the Nurse's Station during the conversation between Officer Nield and Nurse Heath; however, the extent of the behavior differs based on which person described the incident. Elkins recalled that Earle kept trying to walk away from Officer Nield, but Officer Nield kept "grabbing her by the sweater jerking her back", which resulted in Earle's breast being exposed. *Amy Elkins Interview*, ECF No. 311-14, at 2. Nurse Heath recalled that Earle became aggressive with the officer, trying to hit Officer Nield with the equipment on the Nurse's Station. *See Andrea Heath Dep.*, ECF No. 311-13, at 17:20; *Andrea*

---

[4] Officer Nield disagrees with this rendition, stating that he did not learn of the denied order until Nurse Blagg informed him after Earle had been brought into an examination room. *See Josh Nield Dep.*, ECF No. 298-7, at 41:3-5.

*Heath Statement*, ECF No. 311-17. Officer Nield remembered that Earle threw papers off the desk, which led him to try to get ahold of her. *See Josh Nield Dep.*, ECF No. 298-7, at 29:13-22. Officer Nield grabbed both of Earle's arms and held them behind her back while standing at the Nurse's Station. *Id.* at 31:13-15. Officer Nield and Nurse Heath then decided to remove Earle from the Nurse's Station and take her to Room 26. *Id.* at 127-128.

Officer Nield escorted Earle to Room 26 while holding her arms to her side. *See id.* at 128:6-16; *see also Melissa Blagg Statement*, ECF No. 311-18, at 1 ("[Patient] was seen walking with officer to room 26 with shirt half off."); *Melissa Blagg Dep.*, ECF No. 311-16, at 47:19-20 ("He had her firmly by the arm and guiding her into the room."). Officer Nield put Earle in the room and held the door shut to prevent Earle from leaving. *Josh Nield Dep.*, ECF No. 298-7, at 40:21-23 ("I know she was pulling on the door because I remember holding the door."). Officer Nield recalled Nurse Blagg informing him at this time that there was no active mental hygiene order in place and that Earle was free to leave. *Id.* at 41:3-5; *see also Melissa Blagg Statement*, ECF No. 311-18, at 1. Inside the room, Earle barricaded the door by placing a chair against the door and sitting on it. *Josh Nield Dep.*, ECF No. 298-7, at 41-42. Officer Nield pushed the door open, and Earle jumped from the chair into a "fighting stance" near the back of the room. *Id.* at 44:14-15. Officer Nield told Earle that she was free to leave and offered her a ride from the hospital. *Id.* at 46:1-2. Nurse Heath also entered the room to ask Earle whether she wanted to go home or be checked back in as a patient. *Andrea Heath Dep.*, ECF No. 311-13, at 22:19-20.

Nurse Heath recalled that Earle became more agitated and aggravated, fixing her eyes on Officer Nield throughout the encounter. *Id.* at 22:21-24. Describing Earle's conduct as aggressive, Nurse Heath stated that Earle jumped on and off the bed repeatedly, moved around the room, grabbed cords to some medical equipment, and began to shove a computer around in

attempts to turn it over. *Id.* at 23-24. Officer Nield recalled that Earle took her shirt off, manipulated her breasts, called him names, and threw some needle cap tops from her pocket at him and Nurse Heath. *Josh Nield Dep.*, ECF No. 298-7, at 47:5-9. In response, Officer Nield arced his taser to try to gain compliance. *Id.* at 47-48; *see also Josh Nield Interview*, ECF No. 311-7, at 14:13. After arcing the taser, Officer Nield recalled that Earle shoved the computer cart towards him, but he managed to push the cart out of the way. *Josh Nield Dep.*, ECF No. 298-7, at 51-52. Earle continued to move towards the corner of the room, and Officer Nield stepped closer towards her. *Id.* at 52:1. Soon after, Earle lunged towards Officer Nield, hitting him in the face and knocking his glasses off. *Id.* at 53:19-21; *see also Andrea Heath Dep.*, ECF No. 311-13, at 25:2-4 ("I saw her hit him at least four times and knock his glasses from his face, and she was still jumping around and I got scared.").

At this point, Nurse Heath left the room and waited in the hallway because she was afraid that Earle would become aggressive towards her. *Id.* at 25. Officer Nield, therefore, was the only person in the room with Earle during the events that led to her death. Officer Nield stated that he tried to grab ahold of Earle's arms to restrain her with handcuffs and pull her down towards the floor for an arrest. *Josh Nield Dep.*, ECF No. 298-7, at 55:5-8. Officer Nield grabbed Earle's left arm, put his hand behind Earle's neck, and pulled her towards him. *Id.* at 55-56. The two spun onto the bed in the room and fell to the ground. *Id.* at 56. From the hallway, Nurse Heath stated that she "did not physically see the patient [Earle] hit the ground, but moving toward the floor." *Andrea Heath Statement*, ECF No. 311-17, at 3. Officer Nield stated that during the fall, he came down with his full body weight by his knee into Earle's chest. *Id.* at 56:20-24. Earle reached up to grab Officer Nield's vest, and Officer Nield secured both of Earle's arms. *Id.* at 58.

Eventually, Officer Nield managed to cuff one of Earle's hands and flip Earle over to cuff the other hand. *Id.* at 59:17-21.

Although Officer Nield was the only person in the room at the time of the incident, several nurses recalled the scene from the hallway. Elkins stated that Nurse Heath left the room but looked at Elkins, saying that "the police officer that [Earle] swung at … called [Earle] a fucking bitch and slammed her to the floor." *Amy Elkins Interview*, ECF No. 311-14.[5] Nurse Blagg stated that she had heard movement in the room from the hallway and walked back to see what was happening inside. *Melissa Blagg Statement*, ECF No. 311-18, at 1. Nurse Blagg's statement indicates that she "saw [the] officer have [the] patient down on ground with his hand on patient's neck, hand cuffing patient." *Id.* After this, she heard Officer Nield call Earle a "dumb fucking bitch." *Id.*; *see also Melissa Blagg Dep.*, ECF No. 311-16, at 51-52 (recalling that Officer Nield was not acting in a "calm and collected manner" towards Earle). Officer Nield does not deny that he used profanity towards Earle, but he could not remember the precise language directed at Earle. *See Josh Nield Dep.*, ECF No. 298-7, at 60:16-19.

Once Officer Nield subdued Earle, he realized that Earle was nonresponsive, so he called the nurses back into the room to assist. *Id.* at 61:1-6. When Nurse Heath reentered the room, Earle was lying on the floor and had agonal respirations. *Andrea Heath Dep.*, ECF No. 311-13, at 27:18-19. Shortly thereafter, Earle was pronounced dead. *See Report of Death Investigation*, ECF No. 298-11. Earle suffered three fractured ribs, and the medical examiner concluded that

---

[5] Questions of admissibility of evidence shall be determined by the Court at trial or through motions in limine. During a summary judgment analysis, parties can submit evidence to the Court in an inadmissible form as long as the evidence could be submitted in an admissible form at trial, including live testimony. *See Cantrell v. Rubenstein*, No. 2:14-cv-17419, 2016 WL 5723601, at *8 (S.D.W. Va. Aug. 23, 2016). Neither party objected to Amy Elkins's interview being considered on summary judgment.

the cause of death was a laceration of the heart due to compression of the thorax. *Id.* at 2-3. At the time of death, Earle was sixty-six years old and weighed 117 pounds. *Id.* at 3.

Plaintiff's claims against Defendants include: constitutional violations for unlawful search and seizure and excessive use of force; failure to train and supervise employees; state law claims for assault and battery; negligent hiring; deliberate indifference; and false imprisonment. *See Pl.'s Third Am. Compl.*, ECF No. 111. Defendants move for summary judgment on the federal claims on the basis of qualified immunity. *See Defs.' Mem. of Law in Supp.*, ECF No. 298.

## II.    Legal Standard

To obtain summary judgment, the moving party must show that no genuine issue as to any material fact remains and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Instead, the Court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986). Any inference, however, "must fall within the range of reasonable probability and not be so tenuous as to amount to speculation or conjecture." *JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001) (citation omitted).

Although the Court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor[.]" *Anderson*, 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23

(1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252. "Mere speculation by the non-movant cannot create a genuine issue of material fact" to avoid summary judgment. *JKC Holding*, 264 F.3d at 465.

### III.  Discussion

Defendants' Summary Judgment Motion asserts the applicability of qualified immunity to Officer Nield, which would justify summary judgment for the claims brought against the City of Huntington as well. *See Defs.' Mem. of Law in Supp.*, ECF No. 298. Defendants argue that Plaintiff cannot demonstrate that the law was clearly established at the time of Officer Nield's alleged constitutional violations.[6] *Id.* at 10-11. Without showing clearly established law, through statute or case precedent, Plaintiff cannot defeat the application of qualified immunity. *Id.* Plaintiff, however, points to West Virginia statutes and case law involving similar sets of facts that should have put Officer Nield on notice that his actions violated the Constitution. *See Pl.'s Resp.*, ECF No. 311, at 15-17. Arguing that Officer Nield's actions violated Earle's constitutional rights and that clearly established law supported these violations, Plaintiff asserts that qualified immunity is inappropriate. *Id.* at 15. The Court directed the parties to brief the municipal liability claims against Defendant City of Huntington and, thus, defers discussion on that claim.

---

[6] Defendants frame the violated rights as: "an excessive force claim where no settled Fourth Amendment principle required the officer, who received dispatch that an individual was the subject of an active mental hygiene order, to second guess the validity of the order or decline to arrest the individual once attacked." *Defs.' Mem. of Law in Supp.*, ECF No. 298, at 15. The Court finds that these characterizations misrepresent Plaintiff's claims against Officer Nield. Plaintiff's unlawful seizure claim is based on the lack of legal authority to transport Earle back to the hospital—even if the mental hygiene order had been granted—and then continue to detain her forcibly once learning that the order was denied, vitiating all reliance on probable cause. The excessive force claim is based on the force used against a person not charged with a crime and the amount of force used to subdue an unarmed person who conveys only a "possible" threat to herself or others.

### a. Qualified Immunity Standard

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In determining whether qualified immunity applies, the court must conduct a two-step analysis. *Id.* at 232. First, the court must determine whether the record supports a violation of a constitutional right. *Id.* Second, the court must determine whether the right was "clearly established at the time of defendant's alleged misconduct." *Id.* (internal quotation marks and citation omitted). To be considered clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987). If both factors result in the affirmative, qualified immunity does not apply. *Pearson*, 555 U.S. at 232. The Supreme Court in *Pearson* directed that the analysis does not need to be applied in sequence depending on the circumstances of each individual case. *Id.* at 236.

### b. Officer Nield's Actions

As indicated by the Court's rendition of the factual background, the record shows that genuine issues of material fact exist for the claims alleged against these Defendants. It is improper for the Court to weigh the contradictory versions of events in a summary judgment analysis as the jury serves as the proper trier of fact. Accordingly, the Court views the facts most favorably to the nonmoving party—in this case Plaintiff. Plaintiff alleges two constitutional violations, and the Court will address them in turn.

### i. Fourth Amendment Unlawful Search and Seizure

The Fourth Amendment provides that a person's right "to be secure in their persons …
against unreasonable searches and seizures … shall not be violated … but upon probable cause."
U.S. Const. amend. IV. A person is seized when "in view of all the circumstances surrounding
the incident, a reasonable person would have believed that he was not free to leave." *United
States v. Gray*, 883 F.2d 320, 322 (4th Cir. 1989) (citation omitted). In *Terry v. Ohio*, the Supreme
Court limited the scope of what constituted a seizure, stating "[o]nly when the officer, by means
of physical force or show of authority, has in some way restrained the liberty of a citizen may we
conclude that a 'seizure' has occurred." 392 U.S. 1, 19 n.16 (1968). Here, Plaintiff asserts three
separate times at which Officer Nield allegedly violated Earle's rights to be free from unlawful
seizure: when she was picked up by Nield at O'Reilly's, when he later presented her at the Nurse's
station, and when he detained her in the examination room. The Court finds that Plaintiff has
provided enough evidence for a jury to conclude that Officer Nield violated Earle's rights to be
free from unlawful seizure after learning of the denied mental hygiene order but not before.

Plaintiff first argues that Officer Nield did not have the authority to seize Earle at the
O'Reilly's Auto Parts store because the dispatcher provided "vague information" on the mental
hygiene order. *Pl.'s Resp.*, ECF No. 311, at 7. The Court agrees with Defendants that Officer
Nield did not have to second-guess the dispatcher's confirmation that a mental hygiene order had
been properly secured. *See White v. Pauly*, 137 S. Ct. 548, 552 (2017) ("No settled Fourth
Amendment principle requires that officer to second-guess the earlier steps already taken by his or
her fellow officers"). The record shows that Officer Nield heard the dispatcher confirm that an
active mental hygiene order existed over Earle. Therefore, Officer Nield did not violate Earle's
constitutional rights for unlawful seizure when acting on what he believed to be an active mental
hygiene order and, thus, receives qualified immunity for this conduct.

Plaintiff next asserts that even if the mental hygiene order had been properly acquired, Officer Nield never had the legal authority to transport Earle. *See Pl.'s Resp.*, ECF No. 311, at 8-9. Citing West Virginia Code § 27-5-1,[7] Plaintiff asserts that only the sheriff—or law enforcement that entered into a written agreement with the sheriff—can transport a person under a mental hygiene order. *Id.* The Court recognizes that the West Virginia statute limits who can transport persons under a mental hygiene order. However, the record shows that the Huntington Police Department routinely transported similar individuals, and Officer Nield believed that the department had a "mutual aid" agreement to assist the sheriff's department. *See Josh Nield Dep.*, ECF No. 298-7, at 21:19-20; *see also id.* at 21:13-16 ("Typically, if they walk away in the city limits, we're dispatched because we're closer to find the individual and then return them to St. Mary's."); *John Williams Dep.*, ECF No. 311-23, at 48:19-21 ("[The sheriff] handle[s] serving [the mental hygiene orders], but a lot of times if we are in contact with that person, we bring them to where our sheriff can take control of them.").

The policy or custom of the Huntington Police Department to assist the sheriff in this regard—even when contrary to the state statute—does not prevent Officer Nield from receiving qualified immunity. In *Santos v. Frederick County Board of Commissioners*, the Fourth Circuit granted officers qualified immunity when they unconstitutionally seized the plaintiff on a civil immigration warrant contrary to authorization provided in federal law. 725 F.3d 451, 465 (4th Cir. 2013) ("[The deputies] lacked authority to enforce civil immigration law and violated Santos's

---

[7] The West Virginia Code provides that "the sheriff of that county shall take said individual [named in the application] into custody and transport him or her to and from the place of hearing and the mental health facility." W. Va. Code § 27-5-1(d) (West 2017); *see also* W. Va. Code § 27-5-10(c) (West 2017) ("Sheriffs and municipal governments are hereby authorized to enter into written agreements whereby certified municipal law-enforcement officers may perform the duties of the sheriff as described in this article.").

rights under the Fourth Amendment when they seized her solely on the basis of the outstanding civil ICE warrant."); *id.* at 469 (applying qualified immunity). Assuming that Officer Nield violated the statute limiting the role of municipal law enforcement, qualified immunity would still attach in this case. Like the officers in *Santos*, Officer Nield allegedly violated a statute that prohibited his seizure of Earle absent a written agreement with the sheriff's department. This alleged violation supports a finding for unconstitutional conduct, but the statute itself does not make the violation clearly established. *Id.* at 469 ("it was not clearly established that local law enforcement officers may not detain or arrest an individual based solely on a suspected or known violation of federal civil immigration law"). Without other support for a clearly established violation, the Court finds that qualified immunity is appropriate. Plaintiff can challenge the policy or custom of the Huntington Police Department as municipal liability, but an officer responding to a dispatcher's call pursuant to department policy is protected by qualified immunity. *See, e.g.*, *id.* at 470 (requiring district court to determine "whether the deputies' unconstitutional actions are attributable to an official policy or custom of the county or the actions of a final county policymaker"); *Collinson v. Gott*, 895 F.2d 994, 1004-05 (4th Cir. 1990) (giving qualified immunity to police officers following presumably valid orders); *Green v. City of Welch*, 822 F. Supp. 1236, 1240 (S.D.W. Va. 1993) (analyzing plaintiff's complaint alleging unconstitutional custom or policy against the city).[8] Accordingly, Officer Nield receives the benefit of qualified immunity for this conduct.

Lastly, Plaintiff argues that Officer Nield did not have the authority to continue his seizure of Earle after learning about the denied order at the Nurse's Station. *Pl.'s Resp.*, ECF No. 311, at 9. The parties do not dispute that Earle should have been free to leave once Officer Nield learned

---

[8] The Court defers ruling on municipal liability until the parties submit additional briefing.

that the mental hygiene order had been denied. *See John Williams Dep.*, ECF No. 311-23, at 48:10-11 ("If we have no order, we have no authority to put them into custody."). The parties disagree as to when Officer Nield heard the information, but a jury must weigh the contradictory version of events. If the jury finds that Officer Nield heard this information at the Nurse's Station as Nurse Heath recalled, further detention of Earle could constitute a Fourth Amendment violation. *See Bailey v. Kennedy*, 349 F.3d 731, 739 (4th Cir. 2003) (explaining that without probable cause to detain a person, the detention violates Fourth Amendment right against unreasonable seizure). Viewing the record favorably to Plaintiff, Officer Nield prevented Earle from walking away and held her arms behind her back to restrict movement. The record further supports that Officer Nield used physical force to lead Earle down the hallway into Room 26. Officer Nield admitted that he held the door closed so Earle could not leave the room once inside. If the information of the denied mental hygiene order was conveyed prior to these restraints, a jury could conclude that Officer Nield violated Earle's liberty by using force to prevent her movement.

At the Pretrial Conference, Defendant argued that an objective police officer in a similar situation may have found reason to detain or arrest Earle for causing a disruption at the Nurse's Station. Citing *Brown v. Gilmore* for the proposition of a potential disorderly conduct detention, Defendant suggested that the facts in evidence support a reasonable officer finding cause to detain Earle for disorderly conduct. 278 F.3d 362, 368 (4th Cir. 2002) (finding that a reasonable officer could determine plaintiff created a breach of peace by not following orders to remove vehicle after accident). However, the witnesses' accounts vary as to the extent of Earle's disruption while at the Nurse's Station. The record also shows that Officer Nield did not believe Earle committed an arrestable offense at the time. Although Officer Nield's recollection constitutes a subjective analysis and cannot control, his account provides evidence to support Plaintiff's argument that no

reasonable officer would have detained Earle at the Nurse's Station. As the record provides contradictory versions of what transpired at the Nurse's Station, the Court cannot say as a matter of law that Officer Nield had sufficient cause to detain Earle to prevent further disruption. A jury must weigh the evidence at trial to determine whether a constitutional violation occurred.

As no federal or state statute speaks directly to this situation, the Court turns to case precedent to determine whether this type of violation was clearly established. However, "it is not required that a right violated already have been recognized by a court in a specific context before such right may be held 'clearly established' for purposes of qualified immunity." *Meyers v. Baltimore Cnty.*, 713 F.3d 723, 734 (4th Cir. 2013). The Supreme Court has recognized that "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). Instead of searching for "fundamentally similar" sets of facts to this case, the Court must recognize precedent in which Defendants were given "fair warning" that the actions taken would be considered unconstitutional. *Id.* Therefore, the Court need not find case law that directly prohibits a police officer from detaining or restraining a person with mental illness when the knowledge of a mental hygiene order's denial was known at the time.

Citizens generally have the right to be free from detention when a police officer lacks probable cause. *See Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979) ("This Court repeatedly has explained that 'probable cause' to justify an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense."). Courts have also recognized a "general right to be free from seizure unless probable cause exists … in the mental health seizure context." *Gooden v. Howard Cnty.*,

954 F.2d 960, 968 (4th Cir. 1992). As the clearly established analysis cannot be applied at this level of generality, a plaintiff must show that "a reasonable official would understand that what he is doing violates that right." *Id.* (citation omitted). Even though the Fourth Circuit has recognized that probable cause in mental health contexts "is not precisely defined", this lack of clarity does not justify awarding qualified immunity in every factual circumstance. *See Bailey*, 349 F.3d at 741.

The Court finds that the factual circumstances in this case support Plaintiff's claim that Officer Nield would not have the legal authority to continue detaining Earle absent some showing of probable cause. *Id.* at 739 ("If probable cause was lacking, then [the plaintiff] has successfully asserted the violation of a constitutional right."). The Mental Hygiene Commissioner denied Earle's mental hygiene application, so no probable cause existed to detain Earle for mental health treatment.[9] Officer Nield further recognized that Earle was free to leave after Nurse Blagg told him of the denied order, indicating that Earle's conduct up to that point did not justify detainment for an arrest from Officer Nield's perspective. *Josh Nield Dep.*, ECF No. 298-7, at 41:4-5 ("So at that point Ms. Earle was free to leave the hospital."); *see also id.* at 43:15-17 (agreeing that Earle

---

[9] If the facts supported an emergency psychiatric situation, Officer Nield would have been legally allowed to detain Earle. *See Gooden*, 954 F.2d at 968 (recognizing that law not clearly established when seizing person for *emergency* psychiatric evaluations under Maryland law). In West Virginia, a person with mental illness can be detained without a valid mental hygiene order during a psychiatric emergency. W. Va. Code § 27-5-2(e) (West 2017). A psychiatric emergency is defined as "an incident during which an individual loses control and behaves in a manner that poses *substantial* likelihood of physical harm to himself, herself or others." *Id.* (emphasis added). Officer Nield stated that Earle's "behavior could have been viewed as potentially dangerous to others or to herself", but this does not equate to a substantial likelihood. *Josh Nield Dep.*, ECF No. 298-7, at 43:20-21. The record supports that Earle did not commit behaviors amounting to a substantial likelihood of physical harm to herself or others until, potentially, the altercation in Room 26. *See Mental Hygiene Order*, ECF No. 298-6, at 2 (noting that likeliness of causing harm was "passively"); *Josh Nield Dep.*, ECF No. 298-7, at 26 (noting Earle's behavior as cooperative, although talking in half sentences).

had not committed a criminal offense at that point). In telling Earle that she was free to leave, Officer Nield agreed that he had no legal authority to continue to detain Earle. Earle's conduct led to an arrestable offense only after the altercation occurred in Room 26. *Id.* at 61:23-24. Accordingly, a jury could find that Officer Nield unlawfully detained Earle without probable cause once he learned that a mental hygiene order had been denied. Whether Officer Nield learned this at the Nurse's Station or in the hallway is a factual determination. As the freedom from unlawful detention has been clearly established and recognized by Officer Nield himself, the Court **DENIES** qualified immunity for Officer Nield for the continued detention of Earle after learning about the mental hygiene order's denial.

### ii. Fourth Amendment Excessive Use of Force

The Fourth Amendment also provides the basis for Plaintiff's claim against Officer Nield for use of excessive force. "The Fourth Amendment prohibition on unreasonable seizures bars police officers from using excessive force to seize a free citizen." *Jones v. Buchanan*, 325 F.3d 520, 527 (4th Cir. 2003). Even when a police officer effectuates a lawful arrest, the Court must judge whether the police officer's use of force was objectively reasonable. *See Graham v. Connor*, 490 U.S. 386, 388 (1989). Rather than look at an officer's intent or motivation in using force, the Court must determine "whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force." *Elliott v. Leavitt*, 99 F.3d 640, 642 (4th Cir. 1996) (citing *Graham*, 490 U.S. at 396-97). Federal courts "weigh the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Jones*, 325 F.3d at 527 (citation omitted). The test requires the Court to consider the specific facts and circumstances of each case, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the

officers or others, and whether the suspect is actively resisting arrest or attempting to evade arrest by flight." *Id.* (internal quotation marks omitted) (quoting *Graham*, 490 U.S. at 396). The Court can also consider the extent of Plaintiff's resulting injury in the analysis. *Id.*

The record, when viewed most favorably towards Plaintiff, supports the conclusion that Officer Nield used excessive force against Earle. The excessive force claim arises from the altercation that erupted once Earle was placed in Room 26. When considering the severity of the crime at issue in this case, Earle had not committed any crime when Officer Nield tried to convince her to leave the room.[10] *See id.* at 528 ("In recent years, we have twice confronted situations in which a plaintiff, subjected to police force, had committed no crime; in each we held that the plaintiff had stated a claim for violation of his constitutional right to be free from excessive police force."). The first indication that Earle could be arrested for her conduct occurred once Earle struck Officer Nield in the face.[11] At this point, Officer Nield attempted to gain control over Earle to arrest her for battery of an officer. Although this crime is not insignificant, the mental state of Earle at the time of the "attack" and the limited harm to Officer Nield justifies weighing this factor in Earle's favor. *See id.* ("Even in a case in which the plaintiff had committed a crime, when the 'offense was a minor one,' we have found that the first *Graham* factor weighed in plaintiff's favor" (quoting *Rowland v. Perry*, 41 F.3d 167, 174 (4th Cir. 1994))).

Next, the Court considers whether Earle posed an immediate threat against Officer Nield or other staff or patients. Plaintiff's evidence supports the objective unreasonableness of Officer Nield's perception that Earle constituted a threat. *See id.* at 528-30 (analyzing the officer's and

---

[10] Any use of excessive force before placing Earle into Room 26 likewise would follow the analysis of force used against an individual who had not committed a crime.

[11] The Court again leaves any determination of whether Earle could be detained for disorderly conduct to the jury.

suspect's actions to determine reasonableness of threat). The record shows that Earle acted erratically at the Nurse's Station and in Room 26, but her actions did not turn threatening until Earle lunged at Officer Nield. *See Andrea Heath Dep.*, ECF No. 311-13, at 25 (recalling how she left the room over fear of getting hit by Earle). Before Earle swung at Officer Nield, Officer Nield arced his taser at her and continued to move towards her in a small room after Earle clearly exhibited aggravation towards Officer Nield. *See id.* at 22:22-24 ("[Earle] never made eye contact with me, she was looking at the officer the whole time, and then she became more aggressive."). There is no dispute that Earle was unarmed at the time (minus some needle cap tops in her pocket) and suffered from mental illness that could have contributed to her aggression towards the officer. The Court also considers Earle's physical attributes in this analysis, noting that Earle was sixty-six years old and weighed only 117 pounds. According to Plaintiff's Response, Officer Nield weighs approximately 260 pounds in comparison. *Pl.'s Resp.*, ECF No. 311, at 14. Lastly, Earle was cornered in a small emergency room and had no possible means to escape as Officer Nield blocked her path. Earle was clearly not in a position to cause harm to other people as patients and staff were all located safely outside of the room. The Court recognizes that Earle constituted a threat once she lunged and swung at Officer Nield, but the threat remained minimal for actual harm or injury, and the Court will weigh this factor in Earle's favor.

The third factor relates to whether Earle resisted arrest. The record supports that Earle continued to swing at Officer Nield once he attempted to subdue her. However, the record also supports that Officer Nield used force against Earle before she ever committed an arrestable offense. The Court finds that this factor does not weigh substantially in favor of one party or the other.

The three-factor test assists the Court in considering whether Officer Nield's actions were objectively reasonable, but the final determination requires looking at the totality of the circumstances. *Jones*, 325 F.3d at 531. Earle ultimately died from her injuries when Officer Nield either fell or intentionally pressed his knee into her chest, fracturing three ribs and lacerating her heart. Although Officer Nield asserted that he acted with reasonable force, the evidence is disputed as to whether he used excessive force given the circumstances. Earle did not a commit a crime until the last few minutes of her life. Earle was unarmed at all times and did not pose a significant threat against Officer Nield. Nurse Elkins recalled that Nurse Heath exclaimed that Officer Nield slammed Earle to the floor. Nurse Blagg stated that Officer Nield had his hand across Earle's neck, and multiple witnesses recall Officer Nield yelling profane statements towards Earle. A jury could find excessive force from this record.

The second step of the qualified immunity inquiry requires that the constitutional violation was clearly established at the time of the incident. The standard again focuses on the objective reasonableness of Officer Nield's actions, determining whether the officer is "on notice that their conduct violates established law even in novel factual circumstances." *Id.* at 531 (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). Although Defendants cite the Supreme Court decision in *White v. Pauly* as determinative in the clearly established analysis, the Court disagrees. *See Def.'s Mem. of Law in Supp.*, ECF No. 298, at 10-15. *White* reaffirms the position that clearly established law cannot "be defined at a high level of generality" but "must be particularized to the facts of the case." 137 S. Ct. at 552 (internal quotation marks and citations omitted). The Supreme Court again rejected the use of *Tennessee v. Garner* and *Graham* precedents as a basis for clearly established law. *Id.* ("For that reason, we have held that *Garner* and *Graham* do not by themselves create clearly established law outside an obvious case." (internal quotation marks

and citation omitted)); *see also Garner*, 471 U.S. 1 (1985); *Graham*, 490 U.S. at 386.   However, *White* does not prohibit a district court finding that an officer's conduct violated clearly established law if the violation is grounded in case law involving a similar set of facts.

The Court recognizes that *Bailey v. Kennedy* does not present the same factual scenario as the circumstances of this case, but the analysis and similarities provide enough information to have put Officer Nield "on notice" that his actions were unlawful.   In *Bailey*, the Fourth Circuit affirmed the district court's denial of qualified immunity for unlawful seizure and excessive force when the police seized and detained Bailey for an emergency mental evaluation.   349 F.3d at 734. The police officers relied on a report from Bailey's neighbor that Bailey was planning on committing suicide.   *Id.*   When Bailey refused to leave his home with the officers, one of the officers forced himself into the house and fought with Bailey.   *Id.* at 735.   Both of the officers then allegedly tackled Bailey to the floor and struck him multiple times before getting Bailey in handcuffs.   *Id.*   In denying qualified immunity, the Fourth Circuit noted that Bailey was also struck multiple times after being secured in handcuffs, which constituted well-established violations of the Constitution.   *Id.* at 745 ("It was especially clear that they were not entitled to use force after [Bailey] was secured face down on the floor in handcuffs and leg restraints."). Although the court emphasized the clarity of the violation after the officers restrained Bailey, the court also recognized that the officers "violated clearly established law in using force to seize [Bailey] when he had committed no crime and when they had no reason to believe he was a danger to himself or others."   *Id.*   Even though Bailey fought with one of the officers before being restrained, the amount of force used after this physical altercation did not justify finding qualified immunity.   *Id.*; *see also Rowland v. Perry*, 41 F.3d 167, 174 (4th Cir. 1994) (denying qualified immunity for excessive force even though plaintiff resisted arrest); *Kane v. Hargis*, 987 F.2d 1005,

1008 (4th Cir. 1993) (denying qualified immunity for excessive force for physical force used after restraining plaintiff post-resisting arrest); *Mayard v. Hopwood*, 105 F.3d 1226, 1228 (8th Cir. 1997) (denying qualified immunity for excessive force for actions taken after arrest even though plaintiff had physically resisted).

Defendants attempt to distinguish *Bailey* from the instant case by highlighting specific factual differences. In *Bailey*, Defendants argue that the officer did not have a mental hygiene warrant to rely upon, and thus, Officer Nield's seizure and force used in this case cannot be considered "random or baseless." *See Def.'s Reply*, ECF No. 320, at 11. Defendants also characterize the emphasis on Bailey's treatment after he was properly secured as the reason for the Fourth Circuit's affirmation of the qualified immunity denial. *Id.* at 11-12. However, the Court finds that these differentiating facts do not make *Bailey* inapposite. Although Officer Nield can rely upon his belief about the mental hygiene order, Officer Nield could not continue detaining Earle after he learned about the order's denial. Additionally, *Bailey* explains that the use of excessive force against an individual who has not committed a crime and represents no threat to himself or others can prevent qualified immunity—not just when the individual is secured. *See Bailey*, 349 F.3d at 745. The evidence is uncontroverted that Earle lunged at Officer Nield before the altercation that led to her death, but this physical resistance, or potential self-defense, may not justify the use of excessive force in effectuating the actual arrest. The Court finds that the circumstances of this case are sufficiently close to the factual circumstances in *Bailey* to put Officer Nield on proper notice that his actions were unconstitutional. Although the instant case involves the application for a mental hygiene warrant and a physical altercation that led to an arrestable offense, these imperfect correlations do not make the *Bailey* case distinguishable beyond application.

Moreover, the unique facts presented in this case make it clear to the Court that a jury could find the force used unlawful. "It is clear that an officer must take into consideration an individual's known personal characteristics—including an individual's physical or mental disabilities—in using force." *Ratliff v. Schackleford*, Civ. No. 2:13-32917, 2015 WL 2452500, at *4 (S.D.W. Va. May 21, 2015). In this case, Officer Nield knew that Earle suffered from some mental illness, witnessed her erratic behavior, listened to her talk gibberish, and, yet, continued to approach her individually when she exhibited aggressive behavior towards his actions. A reasonable officer in Officer Nield's position would have known that arcing a taser and cornering a person suffering mental illness could appear threatening and that hospital personnel could better deescalate the situation. Considering the entire record viewed favorably toward Plaintiff, a reasonable jury could find that Officer Nield used excessive force by taking Earle, a sixty-six-year-old woman suffering mental health issues and weighing only 117 pounds, forcibly to the ground when attempting to subdue her.[12] The Court finds that both prongs for a qualified immunity test have been met and, thus, **DENIES** qualified immunity for Officer Nield in regards to the claims for excessive force.

### c. City of Huntington

In the original Motion for Summary Judgment, Defendants' only argument for summary judgment in favor of the City of Huntington relied on the Court granting summary judgment in favor of Officer Nield for qualified immunity. *See Defs.' Mem. of Law in Supp.*, ECF No. 298, at 15 ("as all claims against the City of Huntington are derivative of the claims against Officer [Nield], these claims should likewise be dismissed"). Defendants presented arguments in the

---

[12] The determination between whether Officer Nield and Earle innocently fell or Officer Nield slammed Earle into the ground is one for the jury to make.

Reply that Plaintiff cannot prove municipal liability as required under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978). *See Defs.' Reply*, ECF No. 320, at 12. The Court subsequently directed the parties to file supplemental briefs discussing municipal liability. *See Order*, ECF No. 343. Accordingly, the Court defers ruling on Defendant City of Huntington's arguments for summary judgment at this time.

### IV.     Conclusion

Accordingly, the Court finds that Officer Nield is entitled to qualified immunity for the detention over Earle before arriving to the hospital. However, the Court finds that enough evidence exists in the record for a jury to determine that Officer Nield violated Earle's constitutional rights by unlawfully detaining her after learning that the mental hygiene order was denied and by using excessive force. The parties have presented competing narratives of what occurred the night of Earle's untimely death, and the Court will not weigh the evidence to determine which narrative reflects the truth. Summary judgment is inappropriate when a jury must decide between genuine issues of material facts. Qualified immunity is likewise inappropriate when the record supports constitutional violations that are clearly established in law. Therefore, the Court **GRANTS in part and DENIES in part** Defendants' Motion for Summary Judgment (ECF No. 297) and **DENIES** the Motion to Set a Hearing on the same (ECF No. 309). The Court defers ruling on the Motion in regards to Defendant City of Huntington's arguments on municipal liability until additional briefing is received.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented parties.

ENTER:      July 11, 2017

ROBERT C. CHAMBERS, CHIEF JUDGE