IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

LUMUMBA EARLE, individually and
as the Personal Representative of the
ESTATE of ANNIE EARLE, deceased,

                Plaintiff,

v.                                  CIVIL ACTION NO.  3:14-29536

CITY OF HUNTINGTON, d/b/a CITY OF
HUNTINGTON POLICE DEPARTMENT,
a municipal corporation, et al.,

                Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court are two Motions for Partial Summary Judgment filed by Defendants St. Mary's Medical Center, Inc. (St. Mary's), Tammy Peyton, Tara Ramsey, Bobbi Adams, Melissa Blagg, and Andrea Heath (collectively Defendants) (ECF Nos. 301, 302). The first motion addresses the allegations of negligence and wrongful death (ECF No. 301). The second motion addresses the allegations of false imprisonment (ECF No. 302). Defendants also moved the Court to Set a Hearing (ECF No. 307) for oral argument on the motions. The Court held a Pretrial Conference on July 5, 2017 and finds another hearing unnecessary. The Court, thus, **DENIES** Defendants' Motion for Hearing (ECF No. 307). For the following reasons, the Court **GRANTS** Defendants' Motion for Partial Summary Judgment on Negligence and Wrongful Death (ECF No. 301) and **GRANTS** Defendants' Motion for Partial Summary Judgment on False Imprisonment (ECF No. 302).

I. **Background**

Plaintiff filed the instant case against Defendants, alleging claims of negligence, wrongful death, and false imprisonment for the actions that led to Ms. Annie Earle's (Earle) unfortunate death on January 11, 2014.[1] *See Pl.'s Third Am. Compl.*, ECF No. 111. According to Starlight Behavioral Health Services (Starlight), Earle had been diagnosed with "Schizophrenia, paranoia type, PTSD, and Major Depressive Order." *See ACT Discharge Summary*, ECF No. 298-2. Earle was originally taken to St. Mary's on January 10, 2014 for treatment for a head laceration. *See Clinical Notes Report*, ECF No. 317-1, at 7.

In the early morning hours of January 11, 2014, Defendants prepared Earle for discharge and contacted Earle's family for transportation back home. *Id.* at 6. The Clinical Notes Report indicates that the nursing staff called Earle's family nine times to arrange transport without response. *Id.* The nurses also called the Huntington Police Department to contact the family and the hospital social worker to arrange alternative transport. *Id.* Although Earle expressed a desire to leave the hospital, Nurse Melissa Blagg encouraged Earle to remain at St. Mary's until someone could transport her home safely. *Id.* at 2-3. The Clinical Notes Report specifies that Earle agreed to stay through 3:00 p.m. that day. *Id.* at 2. Nurse Bobbi Adams filed an Application for Involuntary Custody for Mental Health Examination (mental hygiene order) for Earle at approximately 1:00 p.m. *See Mental Hygiene Order*, ECF No. 328-1, at 8. The application remained pending when, at approximately 4:41 p.m., Earle decided to leave the hospital on her own volition. *See Clinical Notes Report*, ECF No. 317-1, at 2.

---

[1] The factual section herein reviews the same facts presented in a contemporaneous Memorandum Opinion and Order regarding Defendants City of Huntington and Officer Josh Nield's Motion for Summary Judgment. The Court provides the most relevant factual information to the partial summary judgment motions at issue and directs the parties to the contemporaneous Memorandum Opinion and Order for a more thorough factual summary.

Nurse Blagg called Cabell County 911 at approximately 4:53 p.m. to report that Earle had walked away against medical advice. *See 911 Transcript*, ECF No. 301-9; *see also Clinical Notes Report*, ECF No. 317-1, at 2 (marking time called as 4:55 p.m.). Specifically, Nurse Blagg stated, "[w]e had a patient that we were um trying to get a mental hygiene order on and um she left AMA against medical advice." *See 911 Transcript*, ECF No. 301-9. The Mental Health Commissioner denied the mental hygiene order for insufficient facts that Earle was likely to cause harm to herself or others; the denial was marked by voice order at 4:55 p.m. *See Order/Notice*, ECF No. 328-10, at 2. However, Nurse Adams recorded that she received notice of the denial at 4:45 p.m. *See Clinical Notes Report*, ECF No. 317-1, at 8; *see also Bobbi Adams Dep.*, ECF No. 317-7, at 36:20-22. Nurse Adams also noted that she called Nurse Blagg to inform her of the denial at around 4:48 p.m. *Id.* Ms. Donna White, Earle's Starlight caseworker, reported that she received a voicemail from Nurse Adams at 4:52 p.m., informing White that St. Mary's did not have a mental hygiene order over Earle, and Adams "did not believe they would get one." *Statement of Events*, ECF No. 328-3, at 2. When White returned the call at 4:55 p.m., Adams informed her that the mental hygiene order had been denied. *Id.* No one called to update Cabell County 911 when the mental hygiene order was denied.

In response to Nurse Blagg's call, dispatch reported to the police officers that Earle had walked away from St. Mary's. *See CAD Call Info.*, ECF No. 302-8, at 5. A citizen later called Cabell County 911 to inform dispatch that Earle had entered a nearby O'Reilly's Auto Parts store, and dispatch radioed Huntington Police Officer Andre Jackson and Defendant Officer Josh Nield (Officer Nield) to bring Earle back to the hospital.[2] *See Josh Nield Dep.*, ECF No. 301-12, at

---

[2] A more thorough discussion on the events transpiring before Earle returned to St. Mary's appears in the contemporaneously filed Memorandum Opinion and Order on Defendants City of Huntington and Officer Nield's Motion for Summary Judgment.

21:6-9. Officer Nield responded to the store and transported Earle back to the hospital as directed. *Id.* at 28:21-24 (describing that Earle was compliant during transport).

Once arriving at St. Mary's, Officer Nield led Earle to the Nurse's Station in the Emergency Room. *Id.* at 29:8-9. Officer Nield approached Nurse Andrea Heath at the Nurse's Station and told her that he was returning the walkaway. *Id.* at 29:9-10. Nurse Heath advised Officer Nield that Earle was no longer a patient at the hospital and that the mental hygiene order had been denied, so Earle was free to leave.[3] *See Andrea Heath Dep.*, ECF No. 301-5, at 15:12-15; *Melissa Blagg Dep.*, ECF No. 301-2, at 79:9-15. During this discussion, Earle became agitated and started to throw objects from the Nurse's Station. *See Josh Nield Dep.*, ECF No. 301-12, at 29:13-14 ("she threw off some papers from the charge nurse desk. I tried to grab ahold of her at that point."); *Andrea Heath Dep.*, ECF No. 301-5, at 18:2-3 ("she started throwing equipment around"). Officer Nield grabbed both of Earle's arms, stating that he tried to restrain her from causing further disruption. *See Josh Nield Dep.*, ECF No. 301-12, at 29:21-22 ("at that point I was able to get ahold of her with both arms").

Officer Nield and Nurse Heath agreed to take Earle to Emergency Room 26 away from the other patients and staff. *See Andrea Heath Dep.*, ECF No. 301-5, at 189:3-4 ("And the officer said, 'Is there somewhere we can go to talk to her?'").[4] Nurse Heath asked Earle if Earle would like to go home or check back into the hospital as a patient. *Andrea Heath Dep.*, ECF No. 301-5,

---

[3] Officer Nield disagrees with this rendition, stating that he did not learn of the denied order until Nurse Blagg informed him after Earle had been brought to an examination room. *See Josh Nield Dep.*, ECF No. 301-12, at 140:9-14. Although this is a factual determination for the jury in regards to potential liability for Officer Nield, the timing of information does not change the legal analysis for these Defendants.

[4] The record is unclear as to who first suggested that Earle be removed from the common area. Officer Nield recalled only that he could not have picked out Room 26. *Josh Nield Dep.*, ECF No. 301-12, at 140:3-8. The factual dispute, however, is immaterial to the analysis of these claims.

at 21:8-9. Earle never responded to Nurse Heath and maintained eye contact only with Officer Nield throughout the entire encounter. *Id.* at 22:19-24. As Officer Nield spoke to Earle and asked her about leaving, Earle became more aggravated. *Id.* Describing Earle's conduct as aggressive, Nurse Heath stated that Earle jumped on and off the bed repeatedly, moved around the room, grabbed cords to some medical equipment, and began to shove a computer around in attempts to turn it over. *Id.* at 22-23. Officer Nield recalled that Earle shoved the computer cart towards him, but he managed to push the cart out of the way as he moved closer toward Earle. *See Josh Nield Dep.*, ECF No. 301-12, at 51:22-24. Soon after, Earle lunged towards Officer Nield, hitting him in the face and knocking his glasses off. *See id.* at 53:19-21; *Andrea Heath Dep.*, ECF No. 301-5, at 25:2-4 ("I saw her hit him at least four times and knock his glasses from his face, and she was still jumping around and I got scared.").

At this point, Nurse Heath left the room and waited in the hallway because she was afraid that Earle would become aggressive towards her. *Andrea Heath Dep.*, ECF No. 301-5, at 25:21-24. Officer Nield, therefore, was the only person in the room with Earle during the events that led to her death. The parties dispute as to whether Officer Nield fell with Earle to the ground during the attempt to arrest Earle for battery of an officer or whether Officer Nield slammed Earle to the ground.[5] Regardless of how Officer Nield and Earle landed on the floor, the altercation ended with Officer Nield handcuffing Earle. After Officer Nield noticed that Earle was no longer responsive, he called the nursing staff for assistance. Plaintiff does not allege that Defendants' actions after this point were negligent. At Earle's death, Earle was a sixty-six-year-old woman who weighed 117 pounds. *See Report of Death Investigation*, ECF No. 298-11. Earle suffered

---

[5] For a more detailed discussion on the differing accounts, look to the contemporaneous Memorandum and Opinion.

from three fractured ribs. *Id.* The Medical Examiner declared Earle deceased due to the laceration of the heart caused by the compression of the thorax. *See Certificate of Death*, ECF No. 301-13.

Plaintiff's claims against Defendants include negligence, wrongful death, and false imprisonment. *See Pl.'s Third Am. Compl.*, ECF No. 111. Defendants move for summary judgment on the basis that the actions by St. Mary's hospital staff were not negligent, but if they were, Officer Nield's actions served as an intervening cause to absolve liability. *See Defs.' Mem. of Law in Supp. on Negligence*, ECF No. 303, at 1. Defendants also move for summary judgment on the false imprisonment claim, citing the lack of evidence to support Defendants' alleged unlawful detention of Earle. *See Defs.' Mem. of Law in Supp. on False Imprisonment*, ECF No. 304, at 1.

## II.  Legal Standard

To obtain summary judgment, the moving party must show that no genuine issue as to any material fact remains and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Instead, the Court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986). Any inference, however, "must fall within the range of reasonable probability and not be so tenuous as to amount to speculation or conjecture." *JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001) (citation omitted).

Although the Court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence

from which a reasonable juror could return a verdict in his [or her] favor[.]" *Anderson*, 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252. "Mere speculation by the non-movant cannot create a genuine issue of material fact" to avoid summary judgment. *JKC Holding*, 264 F.3d at 465.

### III. Discussion

Defendants filed two separate motions for partial summary judgment. For the negligence claim, Defendants argue that the nursing staff's actions did not amount to negligence as a matter of law, but if the actions did constitute negligence, then Cabell County 911's negligence and Officer Nield's actions served as intervening causes to Earle's death. *See Defs.' Mem. of Law in Supp. on Negligence*, ECF No. 303, at 1. Correlating to this argument, Defendants assert that Plaintiff's wrongful death claim fails as a matter of law because Defendants' actions were not the proximate cause of Earle's death. *Id.* at 18. Plaintiff argues that questions of negligence, proximate cause, and intervening cause should be left for the jury as the record supports a verdict in Plaintiff's favor. *See Pl.'s Resp. on Negligence*, ECF No. 317, at 6.

For the false imprisonment claim, Defendants argue that Plaintiff cannot demonstrate that Defendants unlawfully detained or assisted in the unlawful detention of Earle. *See Defs.' Mem. of Law in Supp. on False Imprisonment*, ECF No. 304, at 1. Plaintiff argues that Defendants' call to Cabell County 911 to report Earle's departure led to Earle's unlawful detention and that Defendants' actions before Earle's departure and upon return supports a false imprisonment claim

that should go to the jury. *See Pl.'s Resp. on False Imprisonment*, ECF No. 328, at 2. The Court will address each Motion for Partial Summary Judgment in turn.

      **a. Negligence**

A federal court sitting in diversity must apply state substantive law. *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996). In a negligence action, the plaintiff must provide evidentiary support for four elements to be proven by a preponderance of the evidence: duty, breach of duty, causation, and damages. *See Carter v. Monsanto Co.*, 575 S.E.2d 342, 347 (W. Va. 2002). "To be actionable, negligence must be the proximate cause of the injury complained of and must be such as might have been reasonably expected to produce an injury." *Anderson v. Moulder*, 394 S.E.2d 61, 72 (W. Va. 1990) (citation omitted). Plaintiff's negligence claim against Defendants are further governed by the West Virginia Medical Professional Liability Act (the Act). *See* W. Va. Code §§ 55-7B-1, et seq. (West 2017). The Act requires two elements for Plaintiff to prove at trial: (1) that the "health care provider failed to exercise that degree of care, skill and learning required or expected" of reasonable providers belonging to the same profession or class acting in similar circumstances; and (2) that the failure constituted the proximate cause to the plaintiff's injury or death. W. Va. Code § 55-7B-3(a) (West 2017). Generally, "[q]uestions of negligence, due care, proximate cause and concurrent negligence present issues of fact for jury determination when the evidence pertaining to such issues is conflicting or where the facts, even though undisputed, are such that reasonable men may draw different conclusions from them." *McAllister v. Weirton Hosp. Co.*, 312 S.E.2d 738, 746 (W. Va. 1983) (quoting *Ratlief v. Yokum*, 280 S.E.2d 584, 587 (W. Va. 1981)). A defendant may be absolved of negligence liability when an intervening cause "constitutes a new effective cause and operates independently of any other

act, making it and it only, the proximate cause of the injury." *Estate of Postlewait ex rel. Postlewait v. Ohio Valley Med. Ctr.*, 591 S.E.2d 226, 233 (W. Va. 2003).

Plaintiff's negligence claim centers around two events: the first focuses on Nurse Blagg's call to Cabell County 911, and the second focuses on the actions taken after Earle's return to St. Mary's. The Court has reviewed the record provided and finds that some issues of fact remain, as noted in the factual background section, but none of the disputes involve genuine issues of material fact to inhibit summary judgment. When the facts are taken in favor of Plaintiff as the nonmoving party, the record still does not warrant different reasonable conclusions. Although Defendants' actions reasonably could constitute negligence with the phone call to Cabell County 911, the Court finds that Cabell County 911's erroneous relay of information constituted an intervening act that proximately caused Earle's return to the hospital. Further, the subsequent actions by Officer Nield at the hospital could be viewed only as an intervening set of events that absolve Defendants of liability in the chain of causation.

Considering first the phone call, the Court assumes without deciding that a reasonable jury could find that Nurse Blagg's decision to call the police and report Earle's departure could constitute negligence. Although Defendants cite to *Brice v. Nkaru* for the proposition that a person cannot be liable for a police officer's subsequent actions when that person provided true and accurate information to the police, the Court finds that the factual circumstances presented here distinguish this case from *Nkaru*. 220 F.3d 233, 238-39 (4th Cir. 2000) ("we are aware of no authority supporting the novel proposition that a witness, by honestly providing information to a law enforcement official, may be held responsible for the official's execution of his independent duty to investigate"). In *Nkaru*, the Fourth Circuit emphasized that "the critical question is whether the witness provided the police with his honest or good faith belief of the facts." *Id.* at

238. If a witness provided only factual information to the police, the subsequent actions of an officer could not be attributed back to the witness. *Id.*

Here, there is evidence in the record that Nurse Blagg received notice that the mental hygiene order was denied before making the phone call to Cabell County 911. If true, the information provided in the phone call was false information—or at least misleading information—because Nurse Blagg never mentioned that the order was denied. This question of timing distinguishes this case from the facts of *Nkaru*. Here, a reasonable jury could find that Nurse Blagg's phrasing was negligent in stating that the hospital was "trying to get a mental order on" Earle without qualifying the statement with the fact that such order had not yet been granted or already had been denied. Moreover, Plaintiff's expert opined that Nurse Blagg should have never called Cabell County 911 to report Earle's departure, stating that calling the police constituted a breach of the standard of care.[6] *See Suzanne Billingsley Dep.*, ECF No. 302-13, at 169:12-21 ("they had no reason to call 911 because of the following; Ms. Earle was a voluntary patient, she was not indicating any thoughts of hurting herself or others, she did not behave in any ways that indicated that she could be a harm to self or others, the detention order had not been decided on by the time she walked out the door and because she was a voluntary patient into the

---

[6] Defendants argue that Plaintiff's experts concede that no standard of care was violated by calling Cabell County 911. *See Defs.' Mem. of Law in Supp. on Negligence*, ECF No. 303, at 6. Defendants point to Dr. Chad Kovala's statement for support: "There's no standard to [call 911] so I don't know—you can't violate it if there's no such standard." *Dr. Chad Kovala Dep.*, ECF No. 301-7, at 121:7-9. Dr. Suzanne Billingsley likewise did not point to a written standard when opining that Nurse Blagg violated the standard of care. *See Suzanne Billingsley Dep.*, ECF No. 302-13, at 213:2-4. However, the Court views the evidence in favor of the nonmoving party, and Dr. Billingsley stated that she could have found a written text supporting her opinion if necessary. Dr. Kovala also stated that he had never heard of someone calling 911 in Nurse Blagg's situation, indicating that he believed it was against normal practice even if not a written standard. Accordingly, the Court will construe the experts' opinions to support a breach of standard of care in this analysis.

hospital and she was not being treated for psychiatric symptoms as a psychiatric patient, she had every right to liberty"); *see id.* at 212:12-14 ("It's a violation of the standard of care to call 911 if the patient was not exhibiting any symptoms or signs of harm to self or others …"). Accordingly, a jury could find that Defendants' decision to call Cabell County 911 to report Earle for leaving constituted negligence.

However, even if a jury found Defendants negligent for making the phone call, the erroneous relay of information by Cabell County 911 was the act that proximately caused Earle's return to the hospital. The Court can make the finding of an intervening cause when material facts are undisputed and when a reasonable jury could not come to different, reasonable conclusions. *See McAllister*, 312 S.E.2d at 746. Although typically left as a jury determination, when "all the evidence relied upon by a party is undisputed and susceptible to only on inference, the question of proximate cause becomes a question of law." *Harbaugh v. Coffinbarger*, 543 S.E.2d 338, 346 (W. Va. 2000) (citation omitted). Here, the witnesses all agree that the police would have no authority to detain Earle on a pending mental hygiene order. Thus, a call to Cabell County 911 on a pending order should not have resulted in Earle's return to the hospital. The dispatcher at Cabell County 911 erroneously told the police officers that the mental hygiene order had been entered, which proximately caused Officer Nield to transport Earle to St. Mary's. The Court finds that Cabell County 911's actions constitutes the effective and independent cause that led to Earle's return. The facts surrounding the dispatcher's error are undisputed, and a reasonable juror could not find Defendants liable for such independent negligence. Accordingly, the Court finds as a matter of law that Cabell County 911's negligence served as an intervening cause to absolve Defendants of liability for Earle's return to the hospital.

Moreover, Officer Nield's conduct constitutes an intervening cause in the chain of causation for the events occurring at the hospital. Officer Nield's decisions to forcefully maintain control over Earle, to take Earle to a private room, and to use force in efforts to restrain Earle operated independently from Defendants' actions. *See Postlewait*, 591 S.E.2d at 233. The parties do not dispute that Officer Nield's actions serve as a proximate cause to Earle's death, and the Court finds that these actions operated independently from Defendants' acts to make Officer Nield's conduct the only proximate cause for Earle's injuries. Plaintiff has failed to provide any concrete evidence to support the reasonable foreseeability of Officer Nield's actions to allow a reasonable juror to find in Plaintiff's favor. The record lacks evidence that shows Defendants assisting Officer Nield in wrongfully detaining Earle or acting in a manner that contributed to Earle's death. Rather, the record shows that Defendants repeatedly asked Earle if she would like to leave the hospital and even offered for Earle to check back in as a patient. The only conduct amounting to a potentially negligent act by Defendants is the phone call to Cabell County 911, but the traumatic events that followed were proximately caused by independent actors.

Plaintiff argues that Defendants should have prevented Officer Nield from taking Earle to Room 26 or intervened during the altercation once in the room. *Pl.'s Resp. on Negligence*, ECF No. 317, at 14-16. Both of Plaintiff's experts claim that Defendants breached the standard of care when not assuming control and authority over Earle as a patient. *See Chad Kovala Dep.*, ECF No. 322-2, at 143:20-24; *Suzanne Billingsley Dep.*, ECF No. 317-6, at 92 (referring to standard of care for patients). The Court rejects the experts' premise that Earle was a patient at any point upon return to the hospital before Earle received emergency treatment for the injuries caused by Officer Nield. Nurse Heath told Officer Nield that Earle was free to leave because Earle was no longer a patient at the hospital, and St. Mary's could not detain Earle involuntarily without a mental

hygiene order. In Room 26, Nurse Heath again tried to get Earle to leave the hospital or voluntarily check back in as a patient. Earle never responded to Nurse Heath, and the hospital had no authority to involuntarily commit Earle to a mental evaluation. Although Dr. Kovala stated that Earle should have received a medical screening exam pursuant to federal law once exhibiting an emergent medical condition, the Emergency Medical Treatment and Active Labor Act (EMTALA) sets a standard of care for physicians—not nurses—and does not function as a mechanism for a federal medical malpractice suit. *Chad Kovala Dep.*, ECF No. 322-2, at 152:7-24; *see also Phillips v. Hillcrest Med. Ctr.*, 244 F.3d 790, 798 (10th Cir. 2001) ("EMTALA does not set a federal standard of care or replace pre-existing state medical negligence laws."); *Dollard v. Allen*, 260 F. Supp. 2d 1127, 1131 (D. Wyo. 2003). The Court cannot find any evidence in the record to support the claim that Earle became a patient once she returned to St. Mary's.

Rather, the evidence is undisputed that Earle remained in the custodial control of the officer at all times at the hospital. *See Skip Holbrook Dep.*, ECF No. 301-14, at 50:8-10 ("As far as us maintaining, you know, custody and control of [Earle], it would be until, you know, the call is finished."). Although Earle compliantly walked in with Officer Nield, as soon as the two arrived at the Nurse's Station, Officer Nield used force to restrain Earle. Officer Nield recalled that he led Earle down the hallway to Room 26 while still restraining her arms. Once in Room 26, Officer Nield continued to engage with Earle, trying to convince her to leave the hospital and eventually engaged in a more serious altercation. St. Mary's never resumed care over Earle, so Earle cannot be considered a patient. Accordingly, Plaintiff's experts' opinions on patient standard of care are inapplicable.

Even if Earle could be considered a patient, however, Defendants did not have a duty to intervene in Officer Nield's actions whether at the Nurse's Station or in Room 26. In *E.B. v. West*

*Virginia Regional Jail*, the Supreme Court of Appeals of West Virginia explained that a hospital cannot be liable for the "the mere possibility of improper conduct" by an officer, even when directed at a patient. No. 16-0090, No. 16-0092, 2017 WL 383779, at *5 (W.Va. Jan. 27, 2017). In that case, the court affirmed the circuit court's finding that a hospital did not owe a duty to the petitioner who was allegedly raped by a correctional officer during hospitalization. *Id.* The court found that "liability for negligence arising from a special relationship has been determined by what is probable, not what is possible." *Id.* As the petitioner could not present evidence that the assault by the correctional officer was foreseeable, the hospital did not have a duty to prevent a "possible" attack. *Id.* Similarly, the evidence in this record demonstrates the lack of foreseeability of Officer Nield's actions. Plaintiff's experts can only suggest that injury possibly could result from allowing Officer Nield to enter into a room alone with a person acting erratically from mental illness. *See Chad Kovala Dep.*, ECF No. 301-7, at 139 (describing a risk of injury and a possibility of escalation); *Suzanne Billingsley Dep.*, ECF No. 301-6, at 199-200 (describing foreseeability that Earle could escalate behavior but only possible that Earle could die or suffer serious injury). Nothing in the record suggests that Earle's death was reasonably foreseeable at any point in time. The Court, thus, finds that Defendants did not have a duty to "police the police." *E.B.*, 2017 WL 383779, at *4. Plaintiff's expert's analysis that Defendants should have called a Code Gray to restrain Earle according to protocol does not alter this finding. *See Suzanne Billingsley Dep.*, ECF No. 302-13, at 201 (discussing de-escalation techniques). If Defendants had no duty to intervene or prevent a possible attack, Defendants could not breach a duty.

Accordingly, the Court finds that Plaintiff cannot maintain a cause of action for negligence against Defendants as a matter of law because Cabell County 911's error and Officer Nield's actions at the hospital operated independently of Defendants' and constituted intervening causes.

Officer Nield's conduct with Earle and Earle's unfortunate death were not reasonably foreseeable. Plaintiff has failed to provide concrete evidence to permit a reasonable juror to come to a different conclusion. The Court, therefore, **GRANTS** summary judgment to Defendants on the negligence claim. As the Court granted Defendants' Motion, the Court disagrees with Plaintiff's characterization that the motion was frivolous and denies Plaintiff's request for costs and fees in defending the motion. *See Pl.'s Resp. on Negligence*, ECF No. 317, at 17.

### b. Wrongful Death

West Virginia Code governs whether a party can maintain a wrongful death claim against another. *See* W. Va. Code § 55-7-5 (West 2017). "Whenever the death of a person shall be caused by wrongful act, neglect, or default" and that action constituted the proximate cause of the death or injury, then the person causing such action shall be liable for damages. *Id.* Proximate cause "is that cause, which, in natural and continuous sequence, *unbroken by any efficient intervening cause*, produces the injury, and without which the result would not have occurred." *Evans v. Farmer*, 133 S.E.2d 710, 715 (W. Va. 1963) (emphasis added). Generally, questions of proximate cause are left for jury determination. *See McAllister*, 312 S.E.2d at 746. However, as explained in the previous section, the Court finds that Officer Nield's conduct proximately caused Earle's death and operated independently of Defendants' actions to make his conduct an intervening cause. An intervening cause becomes the only proximate cause for the subsequent injury. *See Postlewait*, 591 S.E.2d at 233. Therefore, Plaintiff cannot sustain an action for wrongful death against Defendants as a matter of law. Accordingly, the Court **GRANTS** summary judgment in favor of Defendants for the wrongful death claim.

### c. False Imprisonment

In West Virginia, a false imprisonment claim requires a plaintiff to show "(1) the detention of the person, and (2) the unlawfulness of the detention and restraint." *Riffe v. Armstrong*, 477 S.E.2d 535, 552 (W. Va. 1996). For mental hygiene orders, "[t]he circuit court, mental hygiene commissioner or designated magistrate may enter an order for the individual named in the application to be detained and taken into custody for the purpose of holding a probable cause hearing." W. Va. Code § 27-5-2 (West 2017). Until an order is entered, however, the individual cannot be involuntarily detained. *Id.* (permitting detention only after mental hygiene order is granted). This Court addressed Plaintiff's claims for false imprisonment in a prior Memorandum Opinion and Order that denied dismissal and summary judgment. *See Earle v. City of Huntington*, Civ. No. 3:14-29536, 2016 WL 3198396, at *6 (S.D.W. Va. June 8, 2016). At that time, the Court pointed to various contentions of factual issues that prevented summary judgment. *Id.* (highlighting question of whether nurses knew of denial before calling Cabell County 911 and possible intent to detain Earle). As discovery has now concluded, the Court finds that Plaintiff cannot show concrete evidence to support a claim for false imprisonment to justify sending the issue to a jury.

The parties have portioned out the false imprisonment claim into three separate events, which the Court will address in turn. The first time segment focuses on Earle's time at St. Mary's before leaving voluntarily. Defendants argue that allowing Earle to remain at the hospital for transport home cannot amount to false imprisonment. *Defs.' Mem. of Law in Supp. on False Imprisonment*, ECF No. 304, at 6. Plaintiff concedes in the briefing that only the hospital chart and recollections of the staff are sources of evidence for this claim. *See Pl.'s Am. Resp. on False Imprisonment*, ECF No. 328, at 7. Plaintiff further admits that encouraging a discharged patient to remain at the hospital does not constitute false imprisonment. *Id.* at 11. Rather, Plaintiff relies

on the inference that Nurse Blagg's call to Cabell County 911 indicates an intent to detain rather than encouragement to stay. *Id.* The Court finds this argument, which is contradicted by evidence, unpersuasive.[7] All the nurses and Huntington Police Department witnesses agree that reporting merely that a mental hygiene order was pending over someone would not result in detention. The medical charts and nurses' recollections are consistent with simply encouraging Earle to remain at the hospital for transport. The Clinical Notes Report indicates that Defendants encouraged Earle to stay at the hospital, and Earle agreed each time. Plaintiff's experts admit that encouraging a person to wait for a safe transport does not constitute restraint or forceful detention. *See Chad Kovala Dep.*, ECF No. 301-7, at 92:6-9 (admitting that waiting in emergency room did not violate standard of care); *Suzanne Billingsley Dep.*, ECF No. 301-6, at 110 (disputing whether Earle was *allowed* to remain but admitting that Defendants did not physically prevent Earle from leaving). Nothing in the record supports Plaintiff's contention that Defendants coerced Earle to stay with the threat of law enforcement intervention,[8] and Nurse Blagg did not call Cabell County 911 until eight minutes after Earle left the hospital. *See Pl.'s Am. Resp. on False Imprisonment*,

---

[7] Although the Court noted that intent was a factual issue in its previous Memorandum Opinion and Order, discovery has concluded, and Plaintiff now must offer some evidence in the record to support its theory of liability. The record provided to the Court does not contain any references—or room for plausible inferences—that Defendants acted intentionally to detain Earle. Discovery has concluded, and any issue of intent is now mere speculation.

[8] Dr. Billingsley opines that Nurse Blagg could have assisted Earle's departure when Earle asked to leave, but nothing in Dr. Billingsley's deposition goes so far to state that Earle was unlawfully detained at the hospital by Defendants. Dr. Billingsley questions how Nurse Blagg encouraged Earle to remain at the hospital, but this assessment—without any evidence to support or refute simple encouragement—does not defeat a summary judgment motion. *See Suzanne Billingsley Dep.*, ECF No. 302-13, at 160-161 (answering question on whether Nurse Blagg prevented Earle from leaving as dependent on what words and tone were used to encourage Earle to remain). Further, the Court agrees with Defendants that a false imprisonment analysis does not focus on the subjective state of mind of the person allegedly being detained but the circumstances as seen to a reasonable person. *See Belcher v. Wal-Mart Stores, Inc.*, 568 S.E.2d 19, 30 (W. Va. 2002) (false imprisonment "depends upon the actions and words of the defendant, which must provide a basis for reasonable apprehension of present confinement" (citation omitted)).

ECF No. 328, at 10. This is most evident by Earle leaving the hospital at 4:41 p.m. without interference.[9] The record lacks concrete evidence to support Plaintiff's false imprisonment claim that Earle was detained at the hospital. The Court, therefore, finds as a matter of law that Defendants could not be liable for false imprisonment for Earle's extended stay at the hospital.

The second time segment focuses on Nurse Blagg's call to Cabell County 911. Defendants argue that Nurse Blagg's phone call did not facilitate Earle's return to the hospital. *See Defs.' Mem. of Law in Supp. on False Imprisonment*, ECF No. 304, at 10. Although Nurse Blagg's call could be considered at least negligent if Nurse Blagg knew of the denied order before calling, the phone call cannot make Defendants liable for false imprisonment. The phone call relayed information that Earle had walked away from the hospital while the hospital had attempted to acquire a mental hygiene order. The record shows that all witnesses agree that a police officer could not detain Earle based on this information. Dispatch's erroneous direction that the hospital had an active mental hygiene order over Earle caused the unlawful detention, not the original call to Cabell County 911.

Further, a person cannot be held liable for the police department's subsequent unlawful detention unless that person took a more active role in directing that action. In *Lusk v. Ira Watson Company*, the Supreme Court of Appeals of West Virginia determined that "absent evidence that the police officers in the present case acted *at the direction of* the merchant, the merchant cannot be deemed liable for" the unlawful detention of a perceived shoplifter. 408 S.E.2d 630, 634 (W. Va. 1991) (emphasis added). If someone calls the police to report factual information without

---

[9] Plaintiff also argues that Nurse Adams's filing for a mental hygiene order was enough to show abuse of process and violations of standard of care to suggest false imprisonment. *See Pl.'s Am. Resp. on False Imprisonment*, ECF No. 328, at 10. The Court finds this argument to be without merit as the application for a mental hygiene order did not detain Earle unlawfully or otherwise.

-18-

directing or instigating a person's subsequent detention, that person cannot be held liable for the police officer's subsequent actions. *Id.* at 633. Although the *Lusk* case involves a merchant's liability for the detention of a shoplifter, the Court finds that the reasoning applies equally to the instant case. Without evidence that Nurse Blagg directed or otherwise extensively involved herself with the police activity in detaining Earle, Defendants cannot be held liable for false imprisonment as a matter of law.

The last time segment focuses on Earle's return to the hospital with Officer Nield. The allegations in this time segment largely follow the same factual circumstances and legal arguments presented in the negligence section. The Court has already found that Earle remained in Officer Nield's control and custody upon return to the hospital and that Defendants had no duty to police the police. Officer Nield's conduct in taking Earle to a private room and the altercation that followed serves as an intervening and proximate cause. Plaintiff's only evidence of Defendants' involvement in the detainment of Earle is the suggestion that Earle be taken back to Room 26. The Court finds that this suggestion, which the record is unclear as to who made the initial request, is not enough to hold Defendants liable for false imprisonment. Providing access to a private room for a police officer and a person in his physical custody does not prove detention, much less the unlawfulness of any detention on the hospital's part. Rather, the record is clear that upon return to the hospital, Defendants told Officer Nield that the order had been denied and that Earle was not a patient, so she was free to leave. Defendants further tried to communicate to Earle that she could go home or check back in as a patient if Earle wanted treatment. Absent evidence showing that Defendants caused or actively engaged in unlawfully restraining and detaining Earle, any claim for false imprisonment is based on mere speculation. Therefore, the Court must grant summary judgment in favor of Defendants.

After considering all three time segments, the Court finds the record devoid of factual support to hold Defendants liable for false imprisonment. The Court, thus, **GRANTS** Defendants' Motion for Partial Summary Judgment on False Imprisonment.

IV. **Conclusion**

Accordingly, the Court finds that no genuine issues of material fact remain and that summary judgment in favor of Defendants is appropriate for all the allegations asserting negligence, wrongful death, and false imprisonment. The Court, thus, **GRANTS** both of Defendants' Motions for Partial Summary Judgment (ECF Nos. 301, 302). As the Court did not require another hearing on the motions, the Court also **DENIES** Defendants' Motion to Set Hearing (ECF No. 307).

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented parties.

ENTER: July 11, 2017

_____
ROBERT C. CHAMBERS, CHIEF JUDGE